AMERICAN HISTORICAL SOCIETY, INC., Appellant, v. WILLIAM A. GLENN, Respondent.

Constitutional law — jurisdiction — New York City Court — provision of New York City Court Act that process and mandates of the court may be executed in any part of State, invalid — jurisdiction limited by Constitution to city of New York — service of summons, in action brought in City Court of New York, on non-resident, without boundaries of city, properly vacated.

1. Section 27 of the New York City Court Act (L. 1926, ch. 539) in so far as it provides that "all process and mandates of the court may be executed in any part of the State," is unconstitutional and void. By section 15 of article 6 of the Constitution the territorial jurisdiction of the City Court is extended throughout the city of New York only, and the additional words "original jurisdiction concurrent with the Supreme Court" mean that within the limits of such territorial jurisdiction the City Court has concurrent jurisdiction with the Supreme Court in the cases specified in that section.

2. The service of a summons, in an action brought in the City Court of the city of New York, upon defendant in the city of Albany, where he resided, was, therefore, properly vacated on the ground that the City Court did not have jurisdiction of defendant nor of the subject-matter of the action.

Reported below, 131 Misc. Rep. 291.

(Argued June 14, 1928; decided July 19, 1928.)

APPEAL from a judgment of the City Court of the City of New York, entered March 9, 1928, upon an order of the Appellate Term, first department, which reversed an order of the City Court denying a motion for a dismissal of the complaint on the ground that the court had no jurisdiction of the person of the defendant nor of the subject-matter of the action and granted the motion.

*Thomas W. Constable* for appellant. Section 27 of the New York City Court Act is constitutional. (*McCann* v. *Gerding*, 29 Misc. Rep. 283; *People* v. *Prudential Ins.*

*Co.*, 204 N. Y. 281; *Liscio* v. *M. S. Constr. Corp.*, N. Y. L. J. Aug. 19, 1927.)

*Jay Leo Rothschild* for respondent. The reports of the Judiciary Convention to the Legislature indicate that the New York City Court was to remain a strictly local court. (*Lewkowicz* v. *Queen Aeroplane Co.*, 207 N. Y. 290.) Though the City Court of New York is now a constitutional court, it is, nevertheless, a local and inferior court. (*Gilbert* v. *York*, 111 N. Y. 544; *Landers* v. *Staten Island R. R. Co.*, 53 N. Y. 450.) The concurrent jurisdiction granted to the City Court by the Constitution in actions for money only is of subject-matter, and not of territorial power. (*Landers* v. *Staten Island R. R. Co.*, 53 N. Y. 450; *Worthington* v. *London Guaranty & Acc. Co.*, 164 N. Y. 81; *Armstrong* v. *Shapiro*, 207 App. Div. 304; *Thomas* v. *Harmon*, 122 N. Y. 84; *Howard Ironworks* v. *Buffalo Elevating Co.*, 176 N. Y. 1; *Carroll* v. *Langan*, 63 Hun, 380; *Geraty* v. *Reid*, 78 N. Y. 64; *Failing* v. *Grounds*, 160 App. Div. 71.) Section 27 of the City Court Act is unconstitutional. (*Landers* v. *Staten Island R. R. Co.*, 53 N. Y. 450; *Hoag* v. *Lamont*, 60 N. Y. 96; *Zieglar* v. *Corwin*, 12 App. Div. 60; *Pierson* v. *Fries*, 3 App. Div. 418; *Geraty* v. *Reid*, 78 N. Y. 64; *Browne* v. *City of New York*, 241 N. Y. 96.)

POUND, J. The Judiciary Article (Art. VI, § 15) of the New York State Constitution, as amended in 1925, makes the City Court of the City of New York, theretofore an inferior local court of civil jurisdiction established by the Legislature, a constitutional court and extends its jurisdiction over the entire city. It reads as follows:

" The City Court of the City of New York is *continued*, and, from and after the first day of January in the second year following the adoption of this article, *it shall have the same jurisdiction and power throughout the city of New York, under the name of the City Court of the city of New York, as it now possesses within the county of New*

*York, and the county of Bronx,* and original jurisdiction concurrent with the Supreme Court in actions for the recovery of money only in which the complaint demands judgment for a sum not exceeding $3,000, and interest, and in actions of replevin, foreclosure of mechanic's liens and liens on personal property where the property involved does not exceed in value the sum of $3,000. Its jurisdiction to enter judgment upon a counterclaim shall be unlimited."

At the same time article VI, section 18, was amended to read as follows:

"The Legislature shall not hereafter confer upon any ·inferior or local court of its creation, any equity jurisdiction or any greater jurisdiction in other respects than is conferred upon County Courts by or under this article; *but it may provide that the territorial jurisdiction in civil cases of any inferior or local court now existing or hereafter established in any city or of justices of the peace in cities shall extend throughout the county or counties in which such city may be located  *  *  * "*

Article VI, section 11, was amended to read in part as follows:

"*  *  *  County Courts in counties outside the city of New York shall have the powers and jurisdiction now prescribed by law, and also original jurisdiction in actions for the recovery of money only, *where all the defendants reside in the county and in which the complaint demands judgment for a sum not exceeding $3,000;* *  *  * The Legislature may hereafter enlarge or restrict the jurisdiction of the county courts provided, however, that *their jurisdiction shall not be so extended as to authorize an action therein for the recovery of money only in which (1) The sum demanded exceeds $3,000, or (2) in which any person not a resident of the county is a defendant, unless such defendant have an office for the transaction of business within the county and the cause of action arose therein.*"

After the adoption of these amendments to the Judiciary Article, the Legislature adopted the New York City Court Act (L. 1926, ch. 539, in effect January 1, 1927) repealing the old City Court Act (L. 1920, ch. 935). It provides (§ 27) that " all process and mandates of the court *may be executed in any part of the State.*"

The plaintiff brought this action to recover the sum of $37.50 for books sold and delivered, viz.: " Courts and Lawyers of New York — a History " and for work, labor and services in the execution of a copper plate portrait of defendant, the sum of $125. Defendant was served with process in the city of Albany where he resided. He moved to vacate the service of the summons on the ground that the City Court did not have jurisdiction of him or of the subject of the action and that section 27 of the City Court Act was unconstitutional in so far as it extended the jurisdiction of that court to defendants in such actions who did not reside in the city of New York and had no office for the transaction of business therein. The City Court denied the motion. The Appellate Term on appeal reversed the order of the City Court and granted the motion. The City Court on the remittitur from the Appellate Term granted judgment dismissing plaintiff's complaint.

Constitution (Article VI, § 7), Civil Practice Act (§ 588, subd. 3) provide that an appeal may be taken to the Court of Appeals as of right, from a judgment or order of a court of record of original jurisdiction which finally determines an action or special proceeding where the only question involved on the appeal is the validity of a statutory provision of the State or of the United States under the Constitution of the State or of the United States; and on any such appeal only the constitutional question shall be considered and determined by the court. Pursuant to this provision plaintiff has appealed directly to this court from the judgment of the City Court.

1928.]          Opinion per LEHMAN, J.          [248 N. Y. 415]

*Willoughby,* 11 Paige, 257; *Matter of Lord,* 227 N. Y. 150; *Matter of Blair,* 1 Mylne & Craig, 300.)

*John G. Agar, Alfred Ely* and *Charles S. Ernst* for Charles F. Shourds et al., respondents. The principles established by the authorities do not warrant the granting of the application. (*Matter of Evans,* L. R. [21 Ch. Div.] 297; *Matter of Darling,* L. R. [39 Ch. Div.] 208; *Matter of Hybart,* 119 N. C. 359; *Lewis* v. *Moody,* 261 S. W. Rep. 673.) Petitioner has not adduced sufficient proof to warrant the granting of her application. (*Matter of Lord,* 227 N. Y. 145.)

LEHMAN, J. Ida A. Flagler, the incompetent, is a widow, seventy-eight years of age. She has no descendants. She is incurably insane. Her estate, as shown by the account of her committee, filed February 21st, 1927, is valued at more than eleven million dollars and her annual income is not far from five hundred thousand dollars. The most liberal provision for her benefit, comfort or enjoyment cannot conceivably call for the expenditure of more than a fraction of her income.

The petitioner, Martha M. Mohr, is a second cousin of the incompetent, Mrs. Flagler. Mrs. Flagler's mother and her grandmother were sisters. She is married and has an adopted child. Both she and her husband are now in middle age and not in good health. They have always lived modestly and worked hard. Their earning capacity has always been small. Advancing years and ill health have now reduced it. The husband is out of work. The wife is earning fifteen dollars per week. They have no other means of support.

When they were more prosperous they managed to buy a small home on the installment plan, saving the money necessary to meet the payments as they came due. Now there are unpaid taxes upon the house of $108 and assess-

ments of $200. The roof of the house must be replaced by order of the town authorities, at a cost of $500. Other repairs are necessary to preserve the house from rapid decay. Coal bills, doctor's bills and repair bills are unpaid and Mrs. Mohr has no means of paying them. Misfortune has brought them to want.

These facts were fully established by sufficient evidence upon a reference. The learned referee reported that upon the evidence he was satisfied that if Mrs. Flagler were now competent and the condition of the petitioner were now presented to her, she would grant the petition of Mrs. Mohr to be relieved of her distress. The Supreme Court at Special Term, upon the referee's report, has ordered the committee of the incompetent to pay to the petitioner an allowance at the rate of $30 per week, and the further sum of $700 for unpaid taxes, assessments, interest on the mortgage on petitioner's house and for necessary repairs.

The Appellate Division has held that such allowances may not be made by the court. Convicing proof must be given, it is said, beyond the affluence of the incompetent's estate and the necessities of the applicant that the incompetent person, if sane, would make the allowance asked for, to justify the court in making the allowance. Here it has been held that such proof has not been given.

If Mrs. Flagler to-day could decide upon the disposition of the income of her great estate, moral or charitable considerations would dictate her decision only to the extent that she felt their force. Her great affluence might impel her to relieve the distress of her cousin; the law would not compel her to do so if she decided otherwise. The power of the court to dispose of her income is not plenary. The court may not be moved by its own generous impulses in the disposition of the income of the incompetent. In reaching decision it may give to moral or charitable considerations only such weight as

it finds that the incompetent herself would have given to them. Allowances for the support of collateral relatives of the incompetent have been made " upon the theory that the lunatic would, in all probability, have made such payments if he had been of sound mind." (*Matter of Lord*, 227 N. Y. 145.) The Appellate Division correctly held that the allowance made at Special Term may be justified upon no other theory. Upon an examination of the record we find that the evidence leads logically to the conclusion that Mrs. Flagler, if sane, would to-day provide some relief for the petitioner.

Conflicting inferences might be drawn from the evidence as to Mrs. Flagler's spirit of charity and generosity. At least the evidence shows that when she became wealthy, she remained on friendly terms with her poorer relatives. She was interested in learning how they were getting along; she was not unconscious of family ties. She may not have been very generous; perhaps she might have hesitated to assume the burden of providing support over an indefinite period of time for a needy but unfortunate relative. Certainly the evidence shows that at times she did furnish money, though not in large sums, to relieve distressed cousins. Here the distress of the petitioner is acute. If help is not afforded the petitioner will lose her home. No fault or misconduct on the part of the petitioner has contributed to the petitioner's plight or would palliate, if Mrs. Flagler were sane, the selfishness of a refusal to furnish sufficient help to provide for the petitioner's most pressing needs. There is nothing in the evidence which leads reasonably to a possible inference that Mrs. Flagler, if sane, merely for the purpose of adding an infinitesimal fraction to the annual accumulations of income which she cannot use, would refuse all help. Few would so act under the circumstances here disclosed; the evidence does not justify a finding that Mrs. Flagler, if sane, might have been among the few.

The evidence is convincing that Mrs. Flagler, if sane,

# 420

would have afforded some help to the petitioner. We confine allowance to the limits which in all probability Mrs. Flagler would, at least, have reached. Perhaps Mrs. Flagler might have been unwilling to do more than provide for her cousin's barest needs. Such a limitation of her help might not be entirely incommensurate with worldly standards. It seems to us that at least Mrs. Flagler would have made an immediate gift of $1,200 to pay taxes, assessments, necessary repairs upon the petitioner's house and past due bills and then an allowance of ten dollars per week to eke out the small sums which petitioner and her husband may earn for their support.

We recognize, of course, that the court has a large field for the exercise of its discretion in granting or withholding an allowance even where justification exists for the invocation of its powers. Here the court at Special Term, in the exercise of its discretion, has made a final order granting the allowance. The final order of the Appellate Division, on the reversal of the order of Special Term, is founded upon new findings of fact, though under our practice these facts need not be separately stated. Except for such new findings the final order would have no foundation. Under section 589 of the Civil Practice Act, this court now has jurisdiction to review the facts found by the Appellate Division.

The order of the Appellate Division should be modified by adding provision for such payment and allowance, together with an allowance of $500 to the attorney of the petitioner, with leave to the committee to apply at any time at the foot of the decree to Special Term for a modification of the decree, and the order affirmed as modified, with costs to the appellant in this court and in the Appellate Division payable out of the surplus income of the incompetent.

CARDOZO, Ch. J., POUND, CRANE, KELLOGG and O'BRIEN, JJ., concur; ANDREWS, J., dissents.

Ordered accordingly.

In the Matter of the Estate of Joseph Anna, Deceased. Caroline Bohner et al., Appellants; Edith Anna, as Executrix, Respondent.

**Will — probate — evidence — will leaving property to woman with whom testator was living in meretricious relations and their illegitimate child rather than to his legitimate children — question for jury whether testator was unduly influenced by woman — section 347 of Civil Practice Act not applicable where witness is examined in behalf of adverse party and not in own interest.**

1. While moral depravity does not amount to testamentary incapacity and testator had a right, if he so concluded without being subjected to undue influence, to leave his property to the woman with whom he was living in meretricious relations and their illegitimate offspring rather than to his legitimate children, upon the trial of objections to his will all of the circumstances bearing on the question of undue influence will be carefully scrutinized and if sufficient evidence is offered which, if unexplained, will permit an inference in favor of contestants, it is error for the court to direct a verdict for the proponent.

2. Section 347 of the Civil Practice Act, relative to personal transactions between witness and decedent, has no application to a case where the witness is examined in behalf of the adverse party and not as a witness in his own behalf or interest. It is, therefore, reversible error, upon the trial of issues raised by objections to the probate of an alleged will, to exclude, over objection from her own counsel, testimony of the proponent in response to questions tending to show her relations with decedent directly before she came to live with him.

*Matter of Anna*, 223 App. Div. 806, reversed.

(Argued June 21, 1928; decided July 19, 1928.)

Appeal from an order of the Appellate Division of the Supreme Court in the fourth judicial department, entered March 14, 1928, which affirmed a decree of the Oneida County Surrogate's Court, entered upon the verdict of

a jury, admitting to probate a paper propounded as the last will of Joseph Anna, deceased.

*W. R. Pratt* and *Smith Johnson* for appellants. The surrogate erred in refusing to let the case go to the jury on the question of fraud and undue influence. (*Matter of Hermann*, 150 N. Y. Supp. 118; *Van Ness Will*, 139 N. Y. Supp. 485; *Rollwagen* v. *Rollwagen*, 63 N. Y. 519.) The surrogate erred in the exclusion of testimony. (*Harrington* v. *Schiller*, 231 N. Y. 278.)

*James F. Hubbell* for respondent. The surrogate rightly directed a verdict for the proponent on the question of undue influence. (*Matter of Kindberg*, 207 N. Y. 220; *Matter of Reuf*, 180 App. Div. 203; 223 N. Y. 582; *Matter of Cutter*, 175 App. Div. 647; *Matter of Powers*, 176 App. Div. 455; *Matter of Fleischmann*, 176 App. Div. 785; *Matter of Smith*, 180 App. Div. 669; *Matter of Allaway*, 187 App. Div. 87; *Matter of Bundy*, 217 App. Div. 607; *Matter of Rundles*, 216 App. Div. 658.) The surrogate rightly excluded testimony as to acts and conversations of petitioner and testator. (*Griswold* v. *Hart*, 205 N. Y. 384.)

POUND, J. Joseph Anna, the decedent, was a farmer in the town of New Hartford for more than thirty-five years. He died March 5, 1926, when upwards of seventy years of age. His wife had then been dead for some seven years. At the time of his death, the proponent, Edith Roberts, styling herself Edith Anna, was living with him as his wife although she had a husband from whom she had never been divorced. She had, in the spring of 1921, left her husband and family of young children and gone to live with Anna on his farm. She was then forty-three years of age. Shortly after she brought her oldest child, a daughter Alice, about fifteen years old, to live with her. Anna's son, William, commonly known as

Willie, a young man upwards of thirty years old, and his incompetent sister were living with their father when the proponent came there. The relations between father and children were amicable. In October, 1921, proponent had Willie arrested on a charge of rape upon the person of her daughter. He pleaded not guilty. He was never tried and he never returned to his father's home. He was not allowed to testify, over objections of proponent's counsel, whether he was guilty of the crime, although it was proper for the contestants to show that the charge was false. On February 16, 1923, Anna made his will, now offered for probate, in favor of proponent and a child born to her while she was living with him. In March, 1924, the incompetent daughter was committed to the Utica State Hospital, and afterwards to the Rome State School as a mentally defective person. Anna also had two married daughters upwards of forty years of age and a son who had not been heard from since 1911. The only provision he made in the will for any of his children was the creation of a trust of $2,000 for the benefit of the incompetent daughter during her life. He seems to have been worth about $25,000 at the time he made his will, but he had in 1922 taken title to two pieces of real estate in the name of himself and proponent as husband and wife, and in January, 1925, taken a conveyance of a third parcel of real estate in the same manner. He had also transferred a bank account to the name of Joseph or Edith M. Anna.

When the will was offered for probate, objections were filed by the son, William J. Anna, and the married daughters. The issues raised thereby of undue influence, mental incapacity and fraud were tried before a jury in the Surrogate's Court of Oneida county. The learned surrogate, at the close of the evidence, directed a verdict for the proponent on the ground that there was no evidence that decedent ever discussed the will with any one. A decree was thereupon entered admitting the will to pro-

bate. The Appellate Division affirmed by a divided court and the case comes here on the question whether the evidence of undue influence and mental incapacity was sufficient to require its submission to the jury.

As EARL, J., said in *Rollwagen* v. *Rollwagen* (63 N. Y. 504, 519):

" It is impossible to define or describe with precision and exactness what is undue influence; what the quality and the extent of the power of one mind over another must be to make it *undue,* in the sense of the law, when exerted in making a will. Like the question of insanity, it is to some degree open and vague, and must be decided by the application of sound principles and good sense to the facts of each given case. * * * But the influence exercised over a testator which the law regards as undue or illegal, must be such as to destroy his free agency; but no matter how little the influence, if the free agency is destroyed it vitiates the act which is the result of it. In 1 Jarman on Wills, 36, it is said: ' That the amount of undue influences which will be sufficient to invalidate a will must of course vary with the strength or weakness of the mind of the testator; and the influence which would subdue and control a mind naturally weak, or one which had become impaired by age, sickness, disease, intemperance, or any other cause, might have no effect to overcome or mislead a mind naturally strong and unimpaired.'

" The undue influence is not often the subject of direct proof. It can be shown by all the facts and circumstances surrounding the testator, the nature of the will, his family relations, the condition of his health and mind, his dependency upon and subjection to the control of the person supposed to have wielded the influences, the opportunity and disposition of the person to wield it, and the acts and declarations of such person."

As the same judge said in *Matter of Mondorf* (110 N. Y. 450, 456):

" Where such [meretricious] relations exist all the

circumstances attending the execution of a will which may be shown to have been induced thereby will be carefully scrutinized; but the right of a competent testator to make any disposition of his property which pleases him, although it may be unjust and unnatural, will not be curtailed."

The will was drawn by a reputable attorney of the city of Utica, since deceased. His stenographer testified that Anna was a client of the office; that he came alone to the office in regard to the will on two occasions, once when she took the dictation of the will from the attorney and afterwards when he executed it; that she and the deceased attorney were the subscribing witnesses. She made the usual formal proofs of competency and regularity. No other proof was offered by the proponent.

The contestants were able to show an extraordinary history of the relations of the testator and the proponent. In June, 1919, shortly after the death of Mrs. Anna, proponent was a witness for her husband in an action in the Supreme Court brought by him against Anna on a complaint charging him with assault, alienation of affections and criminal conversation. Her evidence is a part of the record in this case. She testified, in a bald and unconvincing way, that Anna had raped her on five separate occasions at her husband's home in the town of New Hartford in the years 1916–1917, and had been repelled on other occasions. He was at that time a neighbor and acquaintance. She swore that on the first occasion in July, 1916, he grabbed her and took her into the other room and had connection with her when the children were in bed at nine o'clock at night. The other instances were detailed in a like matter-of-fact way. She says her husband caught him on the last occasion and they went down the next morning to hire a lawyer and start the suit. Anna testified in his own behalf. He denied the accusations and the jury believed him. After he had won his case he told an old friend

that he was going to take it easy and leave his money to his children. In the spring of 1921 proponent came to live with the man she had thus accused, as his wife. She was not allowed, over objection from her own counsel as to the competency of the evidence, to testify in response to questions tending to show her relations with Anna directly before she came to live with him. This alone was reversible error. Section 347 of the Civil Practice Act, relative to personal transactions between witness and decedent, has no application to a case where the witness is examined in behalf of the adverse party and not as a witness in his own behalf or interest.

In 1923 Anna made this will in her favor after she had had his trusted and helpful son Willie arrested on the charge of raping her fifteen-year old daughter — a charge which seems to have been without foundation.

It is believable that proponent was led by her husband, who appears to have been by no means a model of morality, to testify falsely against Anna; that Willie did ravish her daughter, although she gave no evidence as to that; that testator became so attached to her that he took her in as his wife, drove out his own son in the belief that he had misconducted himself and gave his property to her and their illegitimate offspring because he wanted them to have it. He had a perfect right to do this if he actually reached his own conclusion to make such a disposition of his property without being subjected, not to influence merely, but to undue influence. (*Delafield* v. *Parish*, 25 N. Y. 9.) Moral depravity does not amount to testamentary incapacity.

But the relationships of the parties have much to do with this case. With this low standard of moral conduct we cannot be oblivious to the influence of greed rather than desire on proponent. The action of Roberts against Anna was inspired by the purpose to get money from Anna. It does not appear that he was ever proceeded against criminally or that her moral indignation was

greatly aroused. The civil action failed. In their sub-
sequent relations proponent may have been the pursued
or the pursuer. The evidence does not disclose. Was
it love and affection or the craft of an adventuress
that led her to leave her husband, worthless though he
may have been, and her little children, and take up her
abode with this old man Anna? The relation was as
unnatural as it was meretricious. Was it the mother's
protective instinct that led her to complain against Willie
Anna and to refuse to let his father give bail for him, as
she unquestionably did, when he was arraigned before
the magistrate, or was this another manifestation of
artfulness and greed? A jury had believed that she had
perjured herself in an attempt to get Anna's money in
her husband's lawsuit. She may have perjured herself
when she swore out the warrant against Willie, in order
to influence his father against him.

Anna's arteries were hardening. His mind was not
strong or unimpaired. Senility was creeping upon him.
If left to himself, influenced only by the legitimate
arguments of those about him, he may have had
testamentary capacity. If proponent accused Willie of
raping her daughter, not to protect the child but to
promote her own selfish interests, the jury might find in
that act the exercise of undue influence upon an oversexed
aging man; the act of a designing woman intent on
driving out of the home in disgrace the natural object
of his father's bounty. The woman would not allow
the father to go on the son's bail bond. Was this mental
coercion or was it the exercise of due and proper influence
to restrain the father from an injudicious act?

The burden of proof upon the question of undue
influence rested on the contestants. They, however,
offered sufficient evidence which, if unexplained, made
permissible an inference in their favor. (*Matter of Smith,*
95 N. Y. 516; *Smith* v. *Keller,* 205 N. Y. 39; *Matter of
Kindberg,* 207 N. Y. 220, 228.) It was for the jury to

say whether or not the acts of Mrs. Roberts were " artful and cunning contrivances " (*Marx* v. *McGlynn*, 88 N. Y. 357, 370) which so overcame testator's independent volition as to induce him to do what he otherwise would not have done.

The order of the Appellate Division and decree of the Surrogate's Court should be reversed and a new trial granted, with costs to abide the event.

CARDOZO, Ch. J., ANDREWS, LEHMAN, KELLOGG and O'BRIEN, JJ., concur; CRANE, J., not sitting.

Order reversed, etc.

---

THE STATE BANK, Appellant, *v.* THE CENTRAL MER-
CANTILE BANK, Respondent.

**Banks and banking — negotiable instruments — certificates
of deposit, " payable only to himself [depositor] on return of
this certificate properly endorsed," non-negotiable — bank
not negligent in issuing certificates in such form — not party
to fraud on bank to which they were transferred for value —
renewal of certificates in name of depositor on demand of
transferee not an admission that they were negotiable — non-
negotiable certificates of deposit assignable in absence of
agreement to contrary — dismissal of complaint in action by
transferee to recover on non-negotiable certificates of deposit,
erroneous — transferee may enforce certificates subject to
defenses existing against transferer or itself — sufficiency of
complaint.**

1. Certificates of deposit, not payable to order or bearer, nor by their terms clearly indicating an intention that they should be, but " payable only to himself [depositor] on return of this certificate properly endorsed," are non-negotiable in form. The words " only to himself " destroyed their negotiability. Nor do the words " on return of this certificate properly endorsed," in this connection, import negotiability. The words " properly endorsed " limit the right of the depositor to receive the money and do not enlarge his right to negotiate the certificates.

2. There was no negligence on the part of the defendant, a bank, in issuing the certificates in this form which would estop it from asserting their non-negotiability. The general rule is that the holder of a

non-negotiable promise to pay money occupies no better or other position than the payee and he is chargeable with notice of the legal effect of the instrument. Nor was the defendant bank a party to the accomplishment of a fraud on the plaintiff bank, to which the certificates had been transferred for value. A bank knows, or should know, non-negotiable paper when it sees it; it does not appear that the certificates became negotiable by contract, and it cannot be assumed from the phraseology used that they were negotiable.

3. A contention that the renewal of the certificates on demand of the transferee amounted to an admission that they were negotiable cannot be upheld, where it appears that payment was not demanded and the certificates were renewed in the' name of the depositor. The terms of the certificates indicate their non-negotiable character and no rights in this regard were waived.

4. But, at least in the absence of an express agreement to the contrary, non-negotiable certificates of deposit are assignable and clear language is required to lead to the conclusion that they are not. Such consequences cannot be deduced from uncertain language and where the certificates were issued in part payment, upon discount of the promissory note of the depositor, and no stipulation appears thereon that they were non-transferable or non-assignable or that an assignment would not be binding, it must have been assumed by the parties that the certificates were intended to be assigned and not retained merely as security for the payment of the note held by the bank.

5. In this action, therefore, to recover upon two of such certificates, a dismissal of the complaint, upon the ground that the certificates were neither negotiable nor assignable, was erroneous. The assignee represents the assignor in regard to the claim and may enforce it " subject to any defense or counterclaim, existing against the transferer, before notice of the transfer, or against the transferee." (Personal Propert Law, § 41, subd. 3.)

6. While, technically speaking, the facts should have been alleged in the complaint, it is sufficient as a complaint on an assigned claim as well as on a negotiable instrument.

*State Bank* v. *Central Mercantile Bank,* 223 App. Div. 324, reversed.

(Argued June 11, 1928; decided July 19, 1928.)

APPEAL from a judgment, entered April 19, 1928, upon an order of the Appellate Division of the Supreme Court in the first judicial department, reversing a judgment in favor of plaintiff entered upon a verdict directed by the court, and directing judgment in favor of defendant.

*Frank C. Laughlin, Stewart W. Bowers, Max Silverstein* and *Abraham Rickman* for appellant.   The certificates of deposit are negotiable on their face.   (*Hibbs* v. *Brown,* 190 N. Y. 167; *Manhattan Co.* v. *Morgan,* 242 N. Y. 38; *Nelson* v. *Citizens Bank,* 191 App. Div. 19; *Barnes* v. *Ontario Bank,* 19 N. Y. 152; *Kirkwood* v. *First Nat. Bank,* 40 Neb. 484; *Cornwall* v. *Mc Kinney,* 80 N. W. Rep. 171; *Emerson* v. *Thatcher,* 51 Pac. Rep. 50; *Matter of Beuchner,* 226 N. Y. 440.)   The certificates of deposit are negotiable, taking into consideration the surrounding circumstances under which they were issued.   (*Haddock, Blanchard & Co.* v. *Haddock,* 192 N. Y. 499; *Manhattan Co.* v. *Morgan,* 242 N. Y. 38; *Gray* v. *Germania Fire Ins. Co.,* 155 N. Y. 180; *East River Bank* v. *Hoyt,* 32 N. Y. 119; *Planters Nat. Bank* v. *N. Y. Song & M. Co.,* 177 N. C. 380; *West* v. *First Nat. Bank,* 20 Hun, 408; *Ellis* v. *Western Life Indemnity Co.,* 207 N. Y. 320.)   The defendant is estopped to deny the negotiability of the certificates because, otherwise, it would impute to it a crime.   (Penal Law, § 298; *Fort* v. *Globe & Rutgers Fire Ins. Co.,* 186 App. Div. 185; *Hicks* v. *British-American Assur. Co.,* 162 N. Y. 284; *Riddle* v. *Butler First Nat. Bank,* 27 Fed. Rep. 503; *Logan Nat. Bank* v. *Williamson,* 1 O. C. D. 395.)   Even if it be held that the certificates of deposit are non-negotiable, they are, nevertheless, quasi-negotiable and assignable to the extent that the defendant is precluded from setting up as a defense or counterclaim facts which deny representations contained on the face of the certificates.   (*Bank of U. S.* v. *Public Bank of N. Y. City,* 88 Misc. Rep. 568; *Dollar* v. *Internat. Banking Corp.,* 101 Pac. Rep. 34; *Quinn* v. *Whitney,* 204 N. Y. 363; *Devlin* v. *Mayer,* 63 N. Y. 8; *Fortunata* v. *Patten,* 147 N. Y. 277; *Farone* v. *Hall,* 220 N. Y. Supp. 1; *Ackerman* v. *True,* 175 N. Y. 353; *Henry* v. *Brown,* 19 Johns. 49; *McLellan* v. *Walker,* 26 Me. 114; *Merrill* v. *Merrill,* 3 Mo. 463; *Kemp* v. *McPherson,* 7 Harr. & J. [Md.] 320; *King* v. *Fowler,* 16 Mass. 397; *Dean* v. *Herrold,* 37 Penn.

St. 150; *Kelly* v. *Universal Oil Supply Co.*, 224 Pac. Rep. 261.)

*E. J. Dimock, Barent L. Visscher* and *Eleanor S. Burch* for respondent. The direction of judgment for defendant was correct since the claim of Charles W. Owen on the certificates of deposit is personal to Owen in the sense that it cannot be assigned. (1 Edwards on Bills, Notes & Neg. Inst. 277, § 395; *Cottle* v. *Marine Bank*, 166 N. Y. 53; *Rowley* v. *Nat. Bank of Deposit*, 63 Hun, 550; *Eichner* v. *Bowery Bank*, 24 App. Div. 63; *Rivenburgh* v. *First Nat. Bank*, 103 App. Div. 64; *Zander* v. *N. Y. Security & Trust Co.*, 178 N. Y. 208.) The certificates of deposit sued on are not negotiable. (*Nelson* v. *Citizens Bank*, 191 App. Div. 19; 232 N. Y. 581; *Meyer & Co., Ltd.* v. *Decroix*, 61 L. J. R. Q. B. 205; *Leavitt* v. *Blatchford*, 17 N. Y. 521; *Matter of Ellard*, 62 Misc. Rep. 374.)

POUND, J. The action is brought to recover on two certificates of deposit, one for $25,000 and one for $50,000. Both certificates are in the same form. The one for $25,000 reads as follows:

" Certificate of Deposit
        " Not subject to check.
" THE CENTRAL MERCANTILE BANK OF NEW YORK
" No. 201               NEW YORK, *March 5th*, 1926.
    " Charles W. Owen has deposited in this Bank Twenty-five Thousand and 00/100 Dollars *payable only to himself* four months after date on return of this Certificate properly endorsed with interest at the rate of 3% per annum if allowed to remain four months.
    " No interest after 12 months.
" $25,000                   M. G. KLETZ,
                                " *Vice-Prsident.*"

The complaint alleges that these certificates were before maturity for value received duly indorsed and

transferred to William Goodman-Krasner Corporation, and by it to plaintiff, which thus became the holder and owner thereof, thus asserting the right to recover thereon without regard to defenses or counterclaims of the bank as against Owen. (Neg. Inst. Law, §§ 91, 96; Cons. Laws, ch. 38.)

The answer sets up the defense that the certificates are non-negotiable and non-assignable and are subject to all defenses, counterclaims and setoffs which the defendant has against Charles W. Owen, the person named as payee therein. The trial court held that the certificates were negotiable and gave judgment for the plaintiff. The Appellate Division held that they were neither negotiable nor assignable and dismissed the complaint.

The history of the inception of the certificates of deposit is not without interest. On November 5, 1925, the defendant bank discounted a promissory note for Owen for $150,000 payable four months after date. It deposited to his credit $25,000, less the discount on the note, and issued to him three certificates of deposit, payable four months after date, with interest at three per cent, two for $50,000 each and one for $25,000. The note and the certificates were afterwards renewed and this action is brought to recover on two renewal certificates.

Negotiability is a matter of form rather than substance, although instruments not otherwise negotiable may become negotiable in effect by estoppel or by contract. (*Manhattan Co.* v. *Morgan*, 242 N. Y. 38.)

That the certificates were non-negotiable in form seems clear. They were not payable to order or bearer nor do their terms clearly indicate an intention that they should be. (Neg. Inst. Law, §§ 27, 28, 29.) They were payable only to Owen himself on the return of the certificates properly indorsed. The words " only to himself " destroyed their negotiability. (*Zander* v. *N. Y. Security & Trust Co.*, 178 N. Y. 208; *Nelson* v. *Citizens Bank*, 191 App. Div. 19; affd., on opinion below, 232 N. Y. 581.)

The words " on return of this certificate properly endorsed " in this connection do not import negotiability. To give a sensible meaning to the entire instrument, as we are bound to do if possible, the words " properly endorsed " limit the right of Owen to receive the money and do not enlarge his right to negotiate the certificates. The bank says: " We will pay you on the return of the certificates properly endorsed." It did not thereby achieve the contradictory result of making the certificates payable to Owen only, at the same time permitting him to negotiate them. (*Cottle* v. *Marine Bank,* 166 N. Y. 53.)

No negligence appears on the part of the bank in issuing the certificates in this form which would estop it from asserting their non-negotiability. The general rule is that the holder of a non-negotiable promise to pay money occupies no better or other position than the payee and he is chargeable with notice of the legal effect of the instrument. The defendant bank was not a party to the accomplishment of a fraud on the plaintiff bank. A bank knows, or should know, non-negotiable paper when it sees it. It does not appear that the certificates became negotiable by contract. Even if it were illegal to issue such non-negotiable certificates (Penal Law, § 298), it could not be assumed from the phraseology used that they were negotiable. The plaintiff finds itself in its present predicament through its own negligence rather than through the fraud or negligence of the defendant.

It is said that the circumstances of the renewal of the certificates amounted to an admission that the certificates were negotiable. Garretson, the vice-president of plaintiff, sent the certificates to defendant indorsed by Charles W. Owen and William Goodman-Krasner Corporation, for renewal. They were not indorsed or stamped by the plaintiff bank. The defendant bank asked why; the plaintiff bank replied, because they wanted them renewed, but offered to put on its stamp and demand payment. The defendant's officer said: " No, we will renew it."

28

Defendant might or might not have paid the certificates if called upon to do so, but payment was not demanded and the certificates were renewed in the name of Owen. The circumstance is negligible on the question of negotiability although it may be pertinent on the question of assignability. (*Lord Cons. Co.* v. *Edison P. C. Co.*, 234 N. Y. 411, 415, 416.) The terms of the certificates indicate their non-negotiable character and no rights in this regard were waived. (*Rapps* v. *Gottleib*, 142 N. Y. 164; *Knox* v. *Eden Musee Co.*, 148 N. Y. 441; *Am. Ex. N. Bank* v. *Woodlawn Cemetery*, 194 N. Y. 116; *Peoples Trust Co.* v. *Smith*, 215 N. Y. 488; *Manhattan Co.* v. *Morgan, supra.*)

The question of assignability remains to be considered. In the absence of an agreement to the contrary, the power to assign and the power to transmit to personal representatives are said to be convertible propositions — at least survivability is one test of assignability (*Zabriskie* v. *Smith*, 13 N. Y. 322, 334; *Devlin* v. *Mayor*, 63 N. Y. 8, 15), and the rights here in question would survive the death of Owen.

Is non-assignability of the rights arising under non-negotiable instruments for the payment of money prohibited by any principle of law?

In the Restatement of the Law of Contracts by Professor Williston, adopted by the American Law Institute (§ 151), it is said: "A right may be the subject of effective assignment unless   *   *   *   (c) the assignment is prohibited by the contract creating the right." This exception is based on the fundamental principle of freedom of contract. It is not one of the exceptions contained in Personal Property Law (§ 41) (Cons. Laws, ch. 41) which provides that, with certain exceptions, " *any* claim or demand can be transferred." In *Portuguese-American Bank* v. *Welles* (242 U. S. 7, 11) the alternative fundamental principle of the freedom of alienation of rights was upheld. The moneys payable on a contract were not to

be assigned without the consent of the debtor party thereto. They were assigned.   It was intimated that the debtor could not complain, but in fact he did not.   The analogy is drawn between the alienation of a debt and of a chattel. A vendor of a horse, it is said  may not prohibit the vendee to sell the horse; *ergo,* the same rule should be applied to the sale of a debt, both being personal property. (Gen. Const. Law, § 39; Cons. Laws, ch. 22.)

We need not choose between these alternatives, although it might well be held that by the Personal Property Law of New York (§ 41) the claim could be transferred even though the transfer was prohibited.   Non-negotiable certificates of deposit are assignable in the absence of an agreement to the contrary.   (*Quinn* v. *Whitney,* 204 N. Y. 363.)   There is no reason for holding the assignment unlawful or inoperative.   (*Rosenthal P. Co.* v. *Nat. Folding Box & Paper Co.,* 226 N. Y. 313, 326.)

Clear language should, therefore, be required to lead to the conclusion that the certificates are not assignable. (1 Williston on Contracts, § 422.)   We cannot deduce such consequences from uncertain language.   (*Scheffer* v. *Erie Co. Sav. Bank,* 229 N. Y. 50.)   The plainest words should have been chosen, so that he who runs could read, in order to limit the freedom of alienation of rights and prohibit the assignment.   It might have been stipulated on the face of the certificates that they should be " non-transferable " or " non-assignable."   (*Tabler, Crudup & Co.* v. *Sheffield Land, Iron & Coal Co.,* 79 Ala. 377; *Barringer* v. *Bes Line Construction Co.,* 23 Okla. 131.)   Bramwell, L. J., suggests, with some doubt, in *Brice* v. *Bannister* (3 Q. B. D. 569, 581, L. R. 1877–1878) that a stipulation expressly providing that an assignment of the instrument would not be binding might be effective.   Equivalent expressions may be found, but no such stipulation appears here.   Unless the transaction was a mere " act of cupidity and extortion," tainted with usury (*East River Bank* v. *Hoyt,* 32 N. Y. 119) it must have been assumed by the

parties that the certificates were intended to be assigned by the payee and not retained by him merely as security for the payment of the note held by the bank.

Personal Property Law (§ 41, ¶ 3) provides:

" 3. Where a claim or demand can be transferred, the transfer thereof passes an interest, which the transferee may enforce by an action or special proceeding, or interpose as a defense or counterclaim, in his own name, as the transferrer might have done; *subject to any defense or counterclaim, existing against the transferrer, before notice of the transfer, or against the transferee.* But this section does not apply, where the rights or liabilities of a party to a claim or demand, which is transferred, are regulated by special provision of law; nor does it vary the rights or liabilities of a party to a negotiable instrument, which is transferred." In other words, the assignee represents the assignor in regard to the claim. (*Seibert* v. *Dunn,* 216 N. Y. 237; Civil Practice Act, §§ 266, 267.)

The defendant pleaded and offered to make proof of counterclaims to which plaintiff had replied. The evidence was not received by the trial court because it held that the certificates were negotiable. On a new trial the evidence may be fully developed on both sides. It may appear that defendant is estopped by its conduct, rather than by the form of the certificates, to assert its equities against plaintiff. It may appear that it is estopped by the nature of the original transaction to deny that it holds the money free from and unaffected by the equities. We will not prejudge the case on the record before us.

Technically speaking, the facts should have been alleged in the complaint. But it is sufficient as a complaint on an assigned claim as well as on a negotiable instrument.

The judgment should be reversed and a new trial granted, with costs to abide the event.

CARDOZO, Ch. J., CRANE, ANDREWS, LEHMAN, KELLOGG and O'BRIEN, JJ., concur.

Judgment reversed, etc.

ROSA ROSENFELD, Respondent, v. HYMAN AARON et al.,
Appellants.

**Real property — landlord and tenant — lease — deposit as
security that tenant will conform to provisions — conveyance
of property and security — covenant to return security passed
to grantee subject to terms of lease — deposit may be retained
until right to hold it as security has terminated — meaning
of word " re-enter " in clause providing for re-entry by landlord
upon violation by tenant of terms of lease — action to recover
security premature where option to relet has been neither
extinguished nor abandoned.**

1. Where an owner of real property, who had received a deposit of
money as security on a lease thereof, sold the premises subject to the
lease and turned over the deposit to his grantee, who assumed the
grantor's obligation for the return of the security and agreed to indem-
nify him against any claim of the tenants therefor, the covenant to
return passed to the grantee, subject to the terms of the lease and
where the time has not arrived at which the grantor is bound to return
the deposit, he and his grantee are not bound to return it merely
because the premises have been conveyed. The deposit may be
retained until the right to hold it as security has terminated. (*Fallert
Brewing Co.* v. *Blass*, 119 App. Div. 53, distinguished.)

2. Where by a clause in the lease it was provided that in the event
the tenant shall violate or omit to perform any of the covenants or
conditions thereof, " the landlord   *   *   *   may re-enter the same
either by force or otherwise   *   *   *   and may either elect to ter-
minate this lease or term or may relet the said premises at any time
as the agent of the tenant," the word " re-enter," as used, should be
given its natural rather than its common-law meaning and thus sur-
vives dispossess proceedings whereby the grantee was enabled to take
possession of the premises. And it being the agreement of the parties
that the landlord may relet " at any time," unless it appears that he
has by some affirmative act terminated the lease, he may keep it
alive for its entire term for the purpose of reletting. An action to
recover the security is prematurely brought, therefore, where nothing
in the record justifies the conclusion that the option to relet has been
extinguished or abandoned. (*Anzolone* v. *Paskusz*, 96 App. Div. 188,
approved.)

*Rosenfeld* v. *Aaron*, 223 App. Div. 710, reversed.

(Argued June 18, 1928; decided July 19, 1928.)

APPEAL, by permission, from a judgment of the Appellate Division of the Supreme Court in the first judicial department, entered February 27, 1928, unanimously affirming a judgment in favor of plaintiff entered upon a verdict directed by the court.

*Joseph J. Schwartz* for Hyman Aaron, appellant. The conveyance of the property by Aaron to Mazer did not terminate the tenants' obligations under the lease, and Mazer was entitled to have the security held for his benefit. (*Mauro* v. *Alvino*, 90 Misc. Rep. 328; *Kottler* v. *N. Y. Bargain House, Inc.*, 242 N. Y. 37; *Marklove* v. *Utica C. & B. Co.*, 48 Misc. Rep. 269.) Defendant Aaron was entitled to the benefit of any counterclaim or setoff existing in favor of Mazer against the plaintiff or her assignors. (*Iroquois Door Co.* v. *Leavenworth Apartment Co.*, 77 Misc. Rep. 462; *Kneuper Specialty Co.* v. *Kneuper*, 171 App. Div. 555; *Nat. Surety Co.* v. *Seaich*, 171 App. Div. 414; *Wiener* v. *Boehm*, 126 App. Div. 703; *Paris* v. *Lawyers Title Co.*, 206 N. Y. 637.)

*Andrew F. Van Thun, Jr.*, for Abraham Mazer, appellant. Paragraphs " eighth " and " ninth " of the lease are so drawn that liability of the tenants for damage arising from any deficiency in the rent reserved resulting from reletting the premises until September 1, 1930, survives the termination of the relation of landlord and tenant by summary proceedings to recover possession for non-payment of rent, and permits the retention of the deposit until September 1, 1930, as security for the payment and reimbursement to the landlord of any deficiency existing at that time. (*Lenco, Inc.*, v. *Hirschfeld*, 247 N. Y. 44; *Kottler* v. *N. Y. Bargain House, Inc.*, 242 N. Y. 28; *Darmstadt* v. *Knickerbocker Chandelier & El. S. Co.*, 188 App. Div. 129; *Halpern* v. *Manhattan Ave. Theatre Corp.*, 220 N. Y. 655.) The plaintiff, having adopted the agreement of Mazer made for the benefit of her assignors to return the deposit in accordance with the

terms of the lease, is bound thereby. She cannot have the benefit of it without assuming its terms including those of the lease which is made part of it. (*Alexander v. Equitable Life Assur. Society,* 233 N. Y. 300; *Dunning v. Leavitt,* 85 N. Y. 30; *Arnold v. Nichols,* 64 N. Y. 117; Williston on Contracts, § 394; *Lane & Co. v. United Oil Cloth Co.,* 103 App. Div. 378; *DeWitt v. Monjo,* 46 App. Div. 533.) The trial justice erred in holding that the agreement for the return of the deposit contained in the lease was personal to Aaron; that Mazer, as grantee of the reversion and the landlord of the plaintiff's assignors, was not a party interested in the deposit agreement nor entitled to hold the deposit according to the terms of the lease; and that Mazer was liable to the plaintiff for the return of the deposit before September 1, 1930, because he assumed the obligation of Aaron to repay the same. (*Vyvyan v. Arthur,* 1 Barn. & C. 410; *Douglaston Realty Co. v. Hess,* 124 App. Div. 508; *Adler v. Lowenstein,* 52 Misc. Rep. 556; *Mauro v. Alvino,* 90 Misc. Rep. 328.) This action as against the defendant Mazer is premature. The recovery of the deposit must abide the liquidation of the loss. (*Lenco, Inc., v. Hirschfeld,* 247 N. Y. 44.)

*Bennett E. Siegelstein* for respondent. The lease ended and the relationship of landlord and tenant ceased when the summary proceedings were instituted, and the tenant removed from the premises; liability of the tenants to pay rent came to an end, there being no survival clause contained in the lease. (*Tepper v. Minsker Realty Co.,* 156 N. Y. Supp. 667; *Atterbury v. Bank of Washington Heights,* 206 N. Y. Supp. 647; *Seidlitz v. Auerbach,* 230 N. Y. 167; *Hoffman Brewing Co. v. Wuttge,* 234 N. Y. 469; *Cornwell v. Sanford,* 222 N. Y. 248; *Michaels v. Fishel,* 169 N. Y. 381; *Claude v. Shepard,* 122 N. Y. 397; *Wolf v. Rudinsky,* 135 App. Div. 172; *Caesar v. Rubinson,* 174 N. Y. 492; *Feinsot v. Burstein,* 138 N. Y. Supp. 185.)

The action was not premature, and plaintiff's assignors were justified in seeking the return of the security after the termination of the lease by the summary proceedings instituted by the landlord. (*Richards* v. *Browning,* 214 App. Div. 665; 212 N. Y. Supp. 738; *Albert Garage Co., Inc.,* v. *Coan,* N. Y. L. J. June 4, 1927; *Lenco, Inc.,* v. *Hirschfeld,* 247 N. Y. 44; *Halpern* v. *Manhattan Ave. Theatre Corp.,* 220 N. Y. 655; *Blumberg* v. *Corday,* 160 N. Y. Supp. 613; *Cohen* v. *Birns,* 170 N. Y. Supp. 560.) Plaintiff never intended to relinquish nor did she release any rights enforceable against Aaron by alleging an additional claim against Mazer. (*Rosenfeld* v. *Aaron,* 202 N. Y. Supp. 950.)

Pound, J. The action is brought to recover a deposit of $6,000 given as security on a lease of a public garage dated August 5, 1920, for a term of ten years expiring August 31, 1930, made by defendant Aaron to Beringer and Peel. The lease was assigned to Donnelly and Peel, who are plaintiff's assignors of the deposit. Defendant Aaron sold the leased premises and the lease to defendant Mazer who, to induce Aaron to turn the deposit over to him, assumed Aaron's obligation for the return of the security and agreed to indemnify him against any claim of the tenants therefor. Mazer afterwards instituted dispossess proceedings against the tenants and under tenant for non-payment of rent and obtained a final order in summary proceedings in the Municipal Court of the city of New York on March 25, 1923. This action was begun in June, 1923, as against Aaron and in March, 1924, against defendant Mazer. No counterclaim or setoff was pleaded by either defendant. The principal defense is that the action is prematurely brought.

The trial court directed judgment in favor of plaintiff against the defendants and in favor of the defendant Aaron against the defendant Mazer, on the ground that the obligation to return the deposit was personal and did

not run with the land. Aaron was held liable to return the deposit because he no longer owned the land and Mazer because he had agreed to indemnify Aaron This conclusion was arrived at on the authority of *Fallert Brewing Co., Ltd.* v. *Blass* (119 App. Div. 53). In that case, however, the deposit never came into the possession of the grantee of the original lessor. The grantee of the land, it was held, could not compel the grantor to pay the deposit over to him. Here the grantee received the deposit and agreed to indemnify the original landlord. The covenant to return passed to the grantee, subject to the terms of the lease. If the time has not yet arrived at which the landlord is bound to return the deposit, the landlord and his grantee are still in a position to obtain a benefit from holding it in accordance with the terms upon which it was made (*Mauro* v. *Alvino*, 90 Misc. Rep. 328, 330; *Kottler* v. *N. Y. Bargain House, Inc.*, 242 N. Y. 28, 37), and they are not bound to return it merely because the leased premises have been conveyed by the lessor. The deposit may be retained until the right to hold it as security has terminated.

The Appellate Division affirmed without opinion.

The question remains whether paragraph ninth of the lease survives dispossession in summary proceedings. It reads as follows:

"*Ninth.* Tenants have deposited with the landlord the sum of Six thousand (6,000) Dollars, same to be held by the landlord as and for security for the payment of the rent agreed to be paid hereunder and for the reimbursement of the landlord for any expense or damage incurred or suffered because of the failure of the tenants to keep and perform the covenants and conditions of the agreement herein contained and the landlord will return the same to the tenants on the 1st day of September 1930, with interest thereon at the rate of four (4%) per cent per annum payable annually if the tenant shall then have vacated the said premises and shall have in all respects

complied with the covenants and conditions of the agreement herein contained."

Paragraph eighth of the lease reads as follows:

"*Eighth.* In case the tenant shall violate or omit to perform any of the covenants or conditions herein contained or in case the said premises shall become vacant or shall be abandoned or deserted by the tenant, the landlord, or any other person by his order, may re-enter the same, either by force or otherwise, without being liable to any prosecution therefor and may either elect to terminate this lease or term, or may re-let the said premises at any time as the agent of the tenant or otherwise for whatever rent he shall obtain, applying the avails of such letting first to the payment of such expenses as the landlord may be put to in re-entering and re-letting, and then to the payment of the rent due hereunder and the fulfillment of the tenants' covenants, and paying over to the tenants the balance, if any; and in case of a deficiency the tenants shall remain liable therefor."

No warrant was issued in the dispossess proceedings but the removal of the tenants after the issuance and service of the precept therein, whereby the landlord was enabled to take peaceful possession of the premises, canceled and annulled the lease, except as the landlord had by a proper survivorship clause reserved the option to keep it alive for the purpose of reletting and holding the tenants for the deficiency. (*Cornwell* v. *Sanford*, 222 N. Y. 248; *Hoffman Brewing Co.* v. *Wuttge*, 234 N. Y. 469; *Seidlitz* v. *Auerbach*, 230 N. Y. 167.)

It has been held that the word " re-enter," as used in a lease reserving to the lessors the right of re-entry upon default in payment of rent merely, does not, for reasons rooted in the feudal law, cover the removal of the lessee by statutory summary proceedings whereby the lease is terminated (Civ. Prac. Act, § 1434; *Michaels* v. *Fishel*, 169 N. Y. 381), but applies only to such re-entries as do not put an end to the lease, as, *e. g.*, when the premises

become vacant before dispossess proceedings are begun. (*Kottler* v. *N. Y. Bargain House, Inc., supra.*)

The lease may, however, contain a provision making the deposit security for damages after dispossess proceedings. (*Lenco, Inc.,* v. *Hirschfeld,* 247 N. Y. 44.) In *Baylies* v. *Ingram* (84 App. Div. 360; affd., 181 N. Y. 518) it was held that the words the lessor "shall have the right to enter the said premises, either *by process of law or otherwise,*" in case of non-payment of rent or default "in any of the covenants or agreements herein contained," survived the ejection of the lessee by summary proceedings. In *Anzolone* v. *Paskusz* (96 App. Div. 188) the words were, as in the lease now before us, "re-enter the same [premises] either by force or otherwise." The court said:

"Although there may be a strict rule of law applicable generally to the construction of covenants in leases, yet, where from a survey of the whole instrument it appears that the parties intended that the strict rule should not apply, force will not be given to it. * * * In this case the parties to the original leases plainly indicated what they meant by the word ' re-enter,' and with that expression of their intention the technical common-law meaning of the word as used in ancient instruments is displaced. Here the word ' re-enter ' in the 1st clause is associated with other words, which indicate that the re-entry contemplated means repossession. The words are ' re-enter the same either by force or otherwise.' The association of the word ' otherwise ' with the word ' re-enter ' sufficiently indicates that it does not mean a re-entry under one single method, as in an action of ejectment. The word ' otherwise ' necessarily broadens the signification of the word ' re-enter ' and prevents its limitation to the technical definition of that word."

This decision, while never reviewed by this court, has been cited without disapproval in *Halpern* v. *Manhattan Ave. Theatre Corp.* (220 N. Y. 655) and followed in the

lower courts. (*Ashton Holding Co.* v. *Ross*, 98 Misc. Rep. 586.) We now adopt the holding and the reasoning thereon. The security clause is framed to cover the violation or omission to perform any of the covenants or conditions of the lease rather than default in the payment of rent merely. The word " re-enter," as used in the lease, should be given its natural meaning rather than its technical common-law meaning. Thus read, it survives the dispossess proceedings.

After re-entry, the landlord might either " terminate this lease or term " or " relet said premises *at any time* as the agent of the tenant or otherwise." The unexpired term of the lease was some seven years when the landlord took possession. We might require an election either to terminate or relet within a reasonable time (*Lenco, Inc.*, v. *Hirschfeld, supra*, p. 50) if it were not for the fact that the landlord reserved the right to relet the premises " at any time " during the term of the lease. We must give due force to every word of the covenant, if possible. (*Matter of Buechner*, 226 N. Y. 440.) By the agreement of the parties, the landlord may keep the lease alive for its entire term for the purpose of reletting. Until it appears that he has, by some affirmative act, terminated the lease, his right to relet survives until August 31, 1930. It does not appear that the lease has come to an end. " Nothing in the record justifies the conclusion that the option to relet was extinguished or abandoned." (*Lenco, Inc.*, v. *Hirschfeld, supra*, p. 50.) The action is prematurely brought.

The judgment of the Appellate Division and that of the Trial Term should be reversed and the complaint dismissed, with costs in all courts.

CARDOZO, Ch. J., ANDREWS and O'BRIEN, JJ., concur; LEHMAN and KELLOGG, JJ., dissent on the ground that the landlord elected to terminate the lease before he relet; CRANE, J., not sitting.

Judgments reversed, etc.

AMERICAN HISTORICAL SOCIETY, INC., Appellant, *v.*
WILLIAM A. GLENN, Respondent.

**Constitutional law — jurisdiction — New York City Court —
provision of New York City Court Act that process and mandates
of the court may be executed in any part of State, invalid —
jurisdiction limited by Constitution to city of New York —
service of summons, in action brought in City Court of New
York, on non-resident, without boundaries of city, properly
vacated.**

1. Section 27 of the New York City Court Act (L. 1926, ch. 539)
in so far as it provides that " all process and mandates of the court
may be executed in any part of the State," is unconstitutional and void.
By section 15 of article 6 of the Constitution the territorial jurisdiction
of the City Court is extended throughout the city of New York only,
and the additional words " original jurisdiction concurrent with the
Supreme Court " mean that within the limits of such territorial juris-
diction the City Court has concurrent jurisdiction with the Supreme
Court in the cases specified in that section.

2. The service of a summons, in an action brought in the City
Court of the city of New York, upon defendant in the city of Albany,
where he resided, was, therefore, properly vacated on the ground that
the City Court did not have jurisdiction of defendant nor of the
subject-matter of the action.

Reported below, 131 Misc. Rep. 291.

(Argued June 14, 1928; decided July 19, 1928.)

APPEAL from a judgment of the City Court of the
City of New York, entered March 9, 1928, upon an order
of the Appellate Term, first department, which reversed
an order of the City Court denying a motion for a dis-
missal of the complaint on the ground that the court had
no jurisdiction of the person of the defendant nor of the
subject-matter of the action and granted the motion.

*Thomas W. Constable* for appellant.    Section 27 of the
New York City Court Act is constitutional.    (*McCann
v. Gerding,* 29 Misc. Rep. 283; *People* v. *Prudential Ins.*

*Co.,* 204 N. Y. 281; *Liscio* v. *M. S. Constr. Corp.,* N. Y. L. J. Aug. 19, 1927.)

*Jay Leo Rothschild* for respondent.    The reports of the Judiciary Convention to the Legislature indicate that the New York City Court was to remain a strictly local court.    (*Lewkowicz* v. *Queen Aeroplane Co.,* 207 N. Y. 290.)    Though the City Court of New York is now a constitutional court, it is, nevertheless, a local and inferior court.    (*Gilbert* v. *York,* 111 N. Y. 544; *Landers* v. *Staten Island R. R. Co.,* 53 N. Y. 450.)    The concurrent jurisdiction granted to the City Court by the Constitution in actions for money only is of subject-matter, and not of territorial power.    (*Landers* v. *Staten Island R. R. Co.,* 53 N. Y. 450; *Worthington* v. *London Guaranty & Acc. Co.,* 164 N. Y. 81; *Armstrong* v. *Shapiro,* 207 App. Div. 304; *Thomas* v. *Harmon,* 122 N. Y. 84; *Howard Ironworks* v. *Buffalo Elevating Co.,* 176 N. Y. 1; *Carroll* v. *Langan,* 63 Hun, 380; *Geraty* v. *Reid,* 78 N. Y. 64; *Failing* v. *Grounds,* 160 App. Div. 71.)    Section 27 of the City Court Act is unconstitutional.    (*Landers* v. *Staten Island R. R. Co.,* 53 N. Y. 450; *Hoag* v. *Lamont,* 60 N. Y. 96; *Zieglar* v. *Corwin,* 12 App. Div. 60; *Pierson* v. *Fries,* 3 App. Div. 418; *Geraty* v. *Reid,* 78 N. Y. 64; *Browne* v. *City of New York,* 241 N. Y. 96.)

POUND, J.    The Judiciary Article (Art. VI, § 15) of the New York State Constitution, as amended in 1925, makes the City Court of the City of New York, theretofore an inferior local court of civil jurisdiction established by the Legislature, a constitutional court and extends its jurisdiction over the entire city.    It reads as follows:

" The City Court of the City of New York is *continued,* and, from and after the first day of January in the second year following the adoption of this article, *it shall have the same jurisdiction and power throughout the city of New York, under the name of the City Court of the city of New York, as it now possesses within the county of New*

*York, and the county of Bronx,* and original jurisdiction concurrent with the Supreme Court in actions for the recovery of money only in which the complaint demands judgment for a sum not exceeding $3,000, and interest, and in actions of replevin, foreclosure of mechanic's liens and liens on personal property where the property involved does not exceed in value the sum of $3,000. Its jurisdiction to enter judgment upon a counterclaim shall be unlimited."

At the same time article VI, section 18, was amended to read as follows:

" The Legislature shall not hereafter confer upon any inferior or local court of its creation, any equity jurisdiction or any greater jurisdiction in other respects than is conferred upon County Courts by or under this article; *but it may provide that the territorial jurisdiction in civil cases of any inferior or local court now existing or hereafter established in any city or of justices of the peace in cities shall extend throughout the county 'or counties in which such city may be located    *    *    * "*

Article VI, section 11, was amended to read in part as follows:

" *    *    * County Courts in counties outside the city of New York shall have the powers and jurisdiction now prescribed by law, and also original jurisdiction in actions for the recovery of money only, *where all the defendants reside in the county and in which the complaint demands judgment for a sum not exceeding $3,000;    *    *    ** The Legislature may hereafter enlarge or restrict the jurisdiction of the county courts provided, however, that *their jurisdiction shall not be so extended as to authorize an action therein for the recovery of money only in which (1) The sum demanded exceeds $3,000, or (2) in which any person not a resident of the county is a defendant, unless such defendant have an office for the transaction of business within the county and the cause of action arose therein.*"

After the adoption of these amendments to the Judiciary Article, the Legislature adopted the New York City Court Act (L. 1926, ch. 539, in effect January 1, 1927) repealing the old City Court Act (L. 1920, ch. 935). It provides (§ 27) that " all process and mandates of the court *may be executed in any part of the State.*"

The plaintiff brought this action to recover the sum of $37.50 for books sold and delivered, viz.: " Courts and Lawyers of New York — a History " and for work, labor and services in the execution of a copper plate portrait of defendant, the sum of $125. Defendant was served with process in the city of Albany where he resided. He moved to vacate the service of the summons on the ground that the City Court did not have jurisdiction of him or of the subject of the action and that section 27 of the City Court Act was unconstitutional in so far as it extended the jurisdiction of that court to defendants in such actions who did not reside in the city of New York and had no office for the transaction of business therein. The City Court denied the motion. The Appellate Term on appeal reversed the order of the City Court and granted the motion. The City Court on the remittitur from the Appellate Term granted judgment dismissing plaintiff's complaint.

Constitution (Article VI, § 7), Civil Practice Act (§ 588, subd. 3) provide that an appeal may be taken to the Court of Appeals as of right, from a judgment or order of a court of record of original jurisdiction which finally determines an action or special proceeding where the only question involved on the appeal is the validity of a statutory provision of the State or of the United States under the Constitution of the State or of the United States; and on any such appeal only the constitutional question shall be considered and determined by the court. Pursuant to this provision plaintiff has appealed directly to this court from the judgment of the City Court.

The constitutional question to be determined is whether the Legislature may authorize the City Court of the City of New York to issue process, in actions to recover a sum of money only, to be executed outside the city of New York.

The revised Judiciary Article of 1925 was drafted and submitted to the Legislature by a Constitutional Convention created by Laws of 1921, chapter 348, and charged with the duty of considering and reporting to the Legislature suitable amendments to such article. It made several reports to the Legislature, accompanying its proposed amendments, the last dated January 20, 1925, in which it said:

" The text in most instances explains itself and indicates the purpose and intent of the proposed amendments; but the following explanation of reasons for some of the principal amendments may be of aid to the Legislature of 1925."

The report deals at length with the City Court of the City of New York. It says, among other things:

" The Convention of 1921 recommended that the jurisdiction of the existing City Court of the City of New York be extended over the entire city under its present name with its jurisdiction increased to three thousand dollars. This would make its jurisdiction, so far as money demands were concerned, conform to the jurisdiction of the County Courts throughout the remainder of the State, and would tend to relieve the Supreme Court of a large number of cases that are now brought there. * * * *It was believed that the extension of the jurisdiction of this important civil tribunal to cover the whole of the Greater City of New York would be a distinct reform and tend to the better and more effective, economical and satisfactory administration of justice in civil cases.*"

" The City Court of New York as extended would be a court of high importance and dignity with civil jurisdiction over an immense population, *more than one-half*

29

*the inhabitants of the State,* and as such it would be likely to attract the best talent at the bar by the opportunity for a broader field of public service and usefulness. Such a more extended, more important and more dignified court would, it is believed, likewise attract litigants, who would naturally be inclined to seek relief therein rather than submit to the delay which is quite unavoidable in the Supreme Court as our great court of original general jurisdiction."

" Careful consideration was given to the suggestion urged by some of the learned Justices of the City Court of New York that their court should be consolidated with the Supreme Court, as was done in and by the Constitution of 1894 with respect to the Superior Court of the City of New York, the Court of Common Pleas for the City and County of New York, the City Court of Brooklyn and the Superior Court of Buffalo (*vide* old section 5); but in the judgment of the Judiciary Convention of 1921 this would be distinctly inadvisable and *would tend to defeat the essential and beneficent purpose which the City Court now serves of affording to the people of the Greater City of New York, as the County Courts afford to the people of other parts of the State,* the advantage of a tribunal which ought to be less crowded with cases than the Supreme Court and which ought to afford prompter justice to litigants whose claims are of comparatively small amounts, although, of course, such smaller claims frequently constitute a matter of very vital concern to citizens entitled as of right to justice according to law without unnecessary delay.

" It should be added in conclusion upon this important subject that the views of the Judiciary Convention of 1921 after its own investigation and study were in complete accord with the conclusions reached by the Constitutional Convention of 1915 after an exhaustive investigation and study by its Judiciary Committee."

Blackstone says (volume 1, page 87):

" There are three points to be considered in the construction of all remedial statutes; the old law, the mischief, and the remedy: that is, how the common law stood at the making of the act; what the mischief was, for which the common law did not provide; and what remedy the parliament hath provided to cure this mischief. And it is the business of the judges so to construe the act as to suppress the mischief and advance the remedy." The same rule applies to the construction of amendments to the Constitution.

The report of the Judiciary Convention itself says, speaking of the judiciary system of the State:

"A system so erected and long tried surely was not to be discarded without grave and compelling reasons.   *   *   * The convention, therefore, did not feel that it was expected by the legislature, or indeed at liberty, to recast the whole Judiciary Article, radically depart from and discard the existing provisions, and seek to establish a new and theoretically more logical and perfect system, as was urged upon its consideration by some."

With these rules for the interpretation of article VI, section 15, as a part of a revised Judiciary Article, the stumbling block of offense consisting of the words, " original jurisdiction concurrent with the Supreme Court," is removed from the path of judicial construction. Their origin is no longer shrouded in mystery, nor are they, as thus read, deserving of condemnation as vague and inept. As CULLEN, Ch. J., said in *Lewkowicz* v. *Queen Aeroplane Co.* (207 N. Y. 290, 295), involving a similar constitutional question:

" If there were any doubt as to the proper construction of this section, we think it is removed by a review of the action of our several constitutional conventions on the subject of local courts."

Words vague and inept when taken from their context may become lucid when read intelligently as a part of a harmonious whole. The Constitutional Convention of

1921 prepared its revision for the benefit of those who were familiar with the past judicial history of the State and not for the inhabitants of Mars.    Thus read, the language of section 15 aptly and definitely expresses the purpose of the Judiciary Convention in extending and defining the territorial jurisdiction of the City Court.

The City Court has, by virtue of the amendment, original jurisdiction throughout the city of New York, in actions for the recovery of money only, in which the complaint demands judgment for a sum not exceeding $3,000, and interest, concurrent with the Supreme Court, the same as the City Court of the City of New York *now* (*i. e.*, before the adoption of the revised article) *possesses* within the county of New York and the county of Bronx.

Prior to January 1, 1926, when the amended judiciary article took effect, a mandate of the City Court could be executed only within the city of New York, as it existed prior to June 6, 1895, with certain exceptions not applicable here.    (L. 1920, ch. 935, § 37, par. 7.)

The City Court now has civil jurisdiction " over an immense population, more than one-half [not all] the inhabitants of the State."    Its jurisdiction throughout the city is analogous to, although in some respects broader than, that of the County Courts throughout their respective counties.    Its mandate can be executed within the present city of New York but not elsewhere throughout the State.    Other inferior or local courts now existing or hereafter established in any city may by legislative action have their territorial jurisdiction extended throughout the county or counties in which such city is located, but the Constitution itself extends the territorial jurisdiction of the City Court throughout the city of New York.    Within the limits of such territorial jurisdiction, the City Court has concurrent jurisdiction with the Supreme Court in the cases specified in section 15 of article VI of the Constitution.

To construe the section otherwise would not only run

counter to the purpose of the revisers of the Judiciary
Article; it would run counter to every established principle
governing the territorial jurisdiction of local courts.    It
would make of the City Court of New York, which is a
local court of inferior jurisdiction, although a constitu-
tional court, a great spider drawing into its web by its
process the flies of small suits against defendants from
Montauk Point to Lake Erie who had never been within
the limits of the city.    Plaintiffs in Syracuse, Platts-
burgh and Lockport in such litigations must seek their
relief within the local territorial limits of the defendant's
residence or place of business or go into the Supreme
Court.    No reason exists why they should be denied the
equal protection of the Constitution when they are defend-
ants remaining outside the territorial limits of the city
of New York.

To hold otherwise would so raise the City Court to the
level of the Supreme Court as the court of general juris-
diction (Art. VI, § 1) as to make inharmonious the
general provisions of the Judiciary Article.

The City Court may, in general, execute its mandates
in any part of the city of New York.    Within such limits
it has concurrent jurisdiction with the Supreme Court in
the actions specified in section 15.    Thus we have a
consistent scheme of wide jurisdiction, though limited in
amount in actions for the recovery of a sum of money
only, and territorially in such cases to the service of its
summons within the city of New York.

The Declaration of Independence denounces the King
of Great Britain for his oppressions in " abolishing our
most valuable laws, and fundamentally altering the forms
of our government."    It is a great and fundamental
privilege of defendants to have small causes brought in
local courts heard in their own territory.    The people of
the State of New York have not so disastrously oppressed
themselves as to sanction such " attempts by their legis-
lature [as are here asserted] to extend an unwarrantable

jurisdiction " over the inhabitants of the entire State, so long as they keep outside the territorial jurisdiction of the City Court.

The judgment should be affirmed, with costs.

CARDOZO, Ch. J., CRANE, ANDREWS, LEHMAN, KELLOGG and O'BRIEN, JJ., concur.

Judgment affirmed.