In the Matter of THEODORE FRANKLIN GOODCHILD and ROBERT MARSDEN GOODCHILD, Infants.

Surrogate's Court, Kings County, October 9, 1936.

*Pickett & Pickett,* for the petitioner Frederika R. Goodchild, as general guardian.

*Cyrus Levinthal,* for the respondent Philip Gottfried, Inc.

WINGATE, S. The facts in this discovery proceeding are undisputed. On May 21, 1935, the infants, Theodore and Robert Goodchild, were respectively fifteen and eleven years of age, and had no legally appointed guardian. On some undisclosed previous date each had received as a legacy from a grandmother two $1,000 bonds of Atlanta Realty Corporation on Hurt Building, Atlanta, Ga. On February 26, 1932, these bonds had been deposited with the First National Bank of Atlanta, under an agreement dated on the fourth day of that month, the terms of which are not in evidence. The bank had issued two documents denominated " certificates of deposit " one in the name of each infant, which recited the fact of such deposit, and further read: " The holder hereof is entitled to share in the benefits of said agreement in respect of the Bonds against the deposit of which this certificate is issued, and to the right and interests as a depositor, as the same are specified in said Deposit Agreement, an original of which has been filed with the Depository. The holder, by receiving this Certificate, assents to and is bound by the provisions of said Deposit Agreement in the same manner and with the same effect as if he had executed the same. One of the provisions of said Deposit Agreement is that said Depository shall deliver the Securities represented by this Certificate upon the order of the committee. The interest represented by this Certificate is transferable, subject to the terms and conditions of said Deposit Agreement, only on the books of the Depository by the holder hereof in person or by attorney upon surrender of this Certificate, properly endorsed."

Upon the reverse of the receipts or certificates was printed the usual assignment and transfer form.

On May 21, 1935, the infant owners of these documents were residing with their father, Dr. Franklin M. Goodchild, who was merely their " guardian by nature." The latter called them into his room, and without giving them any information as to the nature of the transaction, requested them to sign their names on the backs of their respective certificates, which they did.

Dr. Goodchild thereafter surrendered the documents to one W. J. Fitzgerald, a representative of Robert R. Harcourt & Co., Inc., upon the understanding that the latter was to retain them in his possession and not dispose of them until further authorized by Dr. Goodchild.

Apparently Fitzgerald or some one acting on his behalf, after obtaining possession of the documents, presented them to the Flatbush Savings Bank, in which the infants had accounts, and this institution stamped them on the reverse with legends that the respective signatures were guaranteed.

The following day, May twenty-second, Harcourt & Co., without authority, sold and delivered the certificates to Philip Gottfried, Inc., the present respondent, for the sum of $2,350 which purchased for value and in good faith, and without notice of any facts indicating that the transfer was wrongful, and without any notice or knowledge of any infirmity in the instruments or defects in the title of the person transferring them. This concern thereupon, on the same day and prior to the institution of this proceeding, resold them, receiving the sum of $2,370 therefor.

Although not expressly so stated in the record, it is indicated that none of the moneys so received from the respondent ever found their way into the hands of Dr. Goodchild or the infants. The court is, accordingly, confronted with the unwelcome alternative of determining either that the patrimony of the infants is lost to them, or that the respondent, who admittedly paid value and had no notice of the facts hereinbefore recited, must refund the proceeds or value of the securities.

Whereas no intimation has been made by either party reflecting on the possession of jurisdiction by the surrogate to determine the issues here presented, the fact that this represents an apparently increasing attitude of litigants, tends to render the court additionally alert on this subject upon the submission of a controversy presenting unusual features. It is primary that consent or acquiescence of the parties cannot supply the absence of inherent jurisdiction, if this be absent in fact (*Matter of Mathewson*, 210 App. Div. 572, 573; *Matter of Mondshain*, 186 id. 528, 529; *Matter of Walker*, 136 N. Y. 20, 29; *Matter of Morris*, 134 Misc. 374, 376; *Matter of Welton*, 141 id. 674, 676, 677; *Matter of Von Deilen*, 154 id. 877, 879), and

occasional impression to the contrary notwithstanding, Surrogates' Courts have no wish to extend the sphere of their activities beyond that which is essential for the performance of their natural and specialized functions.

The essence of the position of the present petitioner is that the documents in question formed a part of the estate of the infants and that the events, as hereinbefore noted, which have transpired, were not such as to divest their ownership. In such a situation section 205 of the Surrogate's Court Act furnishes an express authority for the determination of the issue by the surrogate, since it unequivocally authorizes the presentation of a petition in discovery by a guardian in cases in which the facts indicate that " personal property, or the proceeds or value thereof " which is properly the property of his wards is " within the knowledge " of a named respondent. Section 206 further empowers this court upon a demonstration of the existence of such a condition, to direct the return of the property in question, or if it has been aliened, to enforce the " payment of the proceeds or value of such property." These sections have been authoritatively construed to mean just what they apparently say. (*Matter of Wilson*, 252 N. Y. 155, 158, 159.)

It follows, therefore, that since the position of the petitioner is that the title and right to possession of these certificates of the infants had not been divested at the time they came into the hands of the respondent, the controversy is within the express jurisdiction of this court, and it may not decline to adjudicate it on the prayer of the petitioner (*Matter of Lusher*, 159 Misc. 387, 391) although it might not have been displeased had the onus of the determination been placed on another tribunal of co-ordinate jurisdiction.

Before entering upon the consideration of the main legal questions involved, there are two subordinate matters which require comment. The first concerns the location of the burden of proof, and the second, the law in accordance with which the rights of the parties must be determined.

On the former subject, the respondent has admitted that the documents in question came into its possession and seeks to justify such possession and its dealings therewith by a recital of the facts of their acquisition for value from the Harcourt Company and its lack of knowledge of any infirmities of title in their transferor. Since the original title of the infants to the securities is thus admitted, and since a condition once shown to have existed is presumed to continue (*Matter of Auditore*, 136 Misc. 664, 672; affd., 233 App. Div. 740; *Matter of Shupack*, 158 Misc. 873, 891; *Matter of Hagan*,

157 id. 378, 380; *Matter of Goldman,* 156 id. 817, 818; *Matter of Kotlik,* 152 id. 802, 804), the burden is cast upon the respondent of demonstrating all of the essential prerequisites by which such title was terminated and became vested in some one other than the infants. (*Matter of Housman,* 224 N. Y. 525, 526, 527; *Matter of Booth,* 224 App. Div. 363, 365; *Matter of Davis,* 128 Misc. 622, 623; affd., 222 App. Div. 846; *Matter of Calen,* 142 Misc. 363, 365; *Matter of Arthur,* 148 id. 269, 272; *Matter of Wanner,* 146 id. 722, 725; *Matter of Donnelly,* 157 id. 319, 320; *Matter of Lusher,* 159 id. 387, 390.)

The question of the law by which the rights of the parties is to be evaluated is equally unquestionable. The sole issue involved is as to whether the particular acts and events which were performed and transpired, were legally adequate to divest the legal title of these infants in the documents in question. It is primary that the legal effect of acts in general is determinable solely by the law of the place in which they are performed (*Howarth* v. *Angle,* 162 N. Y. 179, 187; *Maxwell* v. *Thompson,* 195 App. Div. 616, 621; affd., 232 N. Y. 619; *Hutchinson* v. *Ward,* 192 id. 375, 380; *Slater* v. *Mex. Nat. R. R. Co.,* 194 U. S. 120, 126; *Pullman's Palace Car Co.* v. *Pennsylvania,* 141 id. 18, 22; *Hervey* v. *R. I. Locomotive Works,* 93 id. 664, 671; *Matter of Killough,* 148 Misc. 73, 80; *Matter of Cohen,* 149 id. 765, 769), and this rule is invariably applied in determinations concerning the transfer of title to documents. (*Weissman* v. *Banque de Bruxelles,* 254 N. Y. 488, 494; *Everett* v. *Vendryes,* 19 id. 436, 437; *Aymar* v. *Sheldon,* 12 Wend. 439, 443, 444; *Hennenlotter* v. *DeOrvananos,* 114 Misc. 333, 334, LAZANSKY, J.; 2 Beale, Conflict of Laws, § 262, subd. 1.) Since, therefore, all of the acts upon which the respondent relies as demonstrating the termination of the title of the infants, occurred within the State of New York, it follows that their efficacy for the accomplishment of this result must be judged by the standards of the laws of this State.

In approaching a consideration of the main question involved, namely, of the termination of the rights of the infants in the documents in question, the precise issues of the litigation as raised by the respondent's affirmative defense require analysis. So far as presently material, this reads: " The respondent further shows and says that it was in possession of the said property described in the petition and further avers that said possession was lawfully obtained for a valuable consideration without notice of the rights of the infants herein, and further avers that prior to the commencement of this proceeding, [it] parted with possession of said property lawfully without notice of the rights of the infants herein."

This affirmative defense is twofold and rests for substantiation on diverse legal theories. The first is that the acts performed, to and including the acquisition of the documents by the respondent, when viewed in the light of the nature of the documents themselves, were, as a matter of law, such as to terminate the admittedly previously existing title of the infants in the subject-matter. The second looks merely to the acts performed by the infants and bases the assertion of present freedom from liability solely on these acts and on the undisputed fact that prior to the institution of this proceeding the respondents had, without notice of the infants' rights, parted with title to the documents. These alternate and diverse positions will be considered in order.

It is the primary rule of the common law, which possesses substantially universal applicability, that an individual may convey no better title to an item of property than that which he himself possesses. This is compressed in legal terminology to the familiar phrase " *Non dat qui non habet.*" It follows, therefore, that in the ordinary case, if the seller of an item of property has no title thereto, a buyer from him will be in no better position. (*Collins* v. *Ralli*, 20 Hun, 246, 251; affd., 85 N. Y. 637; *Pierrepont* v. *Shepard & M. Lumber Co.*, 11 App. Div. 383, 386; *Reichard* v. *Hutton*, 158 id. 122, 131; *Shenfield* v. *Bradley*, 174 N. Y. Supp. 619, 620, not otherwise reported; *Conlan* v. *Latting*, 3 E. D. Smith, 353, 354.)

To conform to the usages of merchants and the necessities of commerce, this otherwise substantially inflexible rule was, during the passage of time, to some extent relaxed by the aid of statutes and judicial decisions in respect to bills of exchange and promissory notes and these " came to have distinct attributes and qualities not pertaining to any other form of contract. They were not only made transferable by delivery and suable in the name of the transferee, but, contrary to the general rule of the common law, ' honest acquisition ' for value was held to give to the transferee a new and original title, wholly independent of that of the prior holder and subject to no infirmity which affected the paper in his hands. The real owner, who had been despoiled of the paper by robbery or theft, or who had lost it without negligence, was concluded from re-claiming it, and the maker, although he had been defrauded in executing it, could not be heard to allege the fraud as a defense against a *bona fide* holder. And the transferee, although he may have been negligent in taking it, and omitted precautions which a prudent man would have taken, nevertheless, unless he acted *mala fide*, his title, according to the doctrine now settled, will prevail. These familiar but arbitrary principles applicable to commercial paper, originating in commercial policy, the encouragement of

trade, the convenience of having some representative of money readily convertible and commanding confidence, while they operate in many cases with great severity upon the rights of innocent persons, have contributed greatly to stimulate commerce and advance the prosperity of States. The principles applicable to negotiable paper have been extended to embrace public debentures payable to bearer, and bonds of corporations, and some of the incidents of negotiability have either by custom or statute been applied to instruments not strictly negotiable. Certificates of stock, in business corporations, are embraced in the class last mentioned. They are not negotiable in form, they represent no debt and are not securities for money. But the courts of this country, in view of the extensive dealings in certificates of shares in corporate enterprises, and the interest both of the public and of the corporation which issues them, in making them readily transferable and convertible, have given to them some of the elements of negotiability." (*Knox* v. *Eden Musee Co., Ltd.*, 148 N. Y. 441, 453, 454.)

As is indicated in the foregoing quotation and in other statements respecting the subject (See *e. g.*, *Manhattan Co.* v. *Morgan*, 242 N. Y. 38, 47, 48), the present law of this State in respect to the question under discussion is in large measure statutory, and the first point of approach in a determination of the rights resulting from the demonstrated actions in the case at bar is the ascertainment of the scope and applicability of these enactments to the present situation. Whereas there are numerous special statutes applicable to particular forms of documents, including those concerned with bills of lading (Pers. Prop. Law, art. 7), warehouse receipts (Pers. Prop. Law, §§ 108 *et seq.*), etc., the parties to the present proceeding are agreed that the only enactments possessing possible relevance upon the demonstrated facts, are the Negotiable Instruments Law itself, and articles 6 and 8 of the Personal Property Law, relating respectively to shares of stock corporations and security receipts.

In *Manhattan Co.* v. *Morgan* (242 N. Y. 38), Chief Judge CARDOZO pointed out (p. 47) that " Negotiable instruments may fall within one or other of two classes. They may represent interests in property, in which event they will give rise to rights *in rem*, or they may be promissory and executory, creating rights *in personam*," intimating a belief, though expressly not deciding, that instruments representing interests in property as distinguished from rights *in personam*, are not within the purview of the Negotiable Instruments Law. In the present case, as in that then adjudicated, this question

is unnecessary for determination. Indeed, in the present instance, it is impossible to ascertain the nature of the rights which the present documents actually give. The language employed is nowise indicative of the nature of the right which the document purports to evidence, stating merely that the named holder " is entitled to share in the benefits of said agreement," namely, that dated February 26, 1932, " and to the right and interests as a depositor as the same are specified in said Deposit Agreement." As stated, the agreement referred to is not in evidence, wherefore there is no method of ascertainment as to whether, for example, the " right and interests " of the depositor thereby secured are for the payment of a specified sum of money, either absolutely or on some stated contingency, which might give the holder a right *in personam* against someone, is for the return of his bonds or receipt of an aliquot interest in the property by which they were presumably secured, which would inferentially create a right *in rem*, or, indeed, gave rise to some other, wholly diverse, rights or interests not properly classifiable wholly in either category.

For present purposes it need only be stated that if the right created is *in personam* only and the Negotiable Instruments Law regulates instruments creating such rights, a transfer of the present documents to a purchaser for value and without notice would not give the immunity or rights asserted by the present respondent, since the documents presently in question do not comply with the form prescribed in section 20 of the Negotiable Instruments Law as prerequisite to the creation of such rights and immunities. (*Manhattan Co.* v. *Morgan*, 242 N. Y. 38, 48, 49.)

The consideration of the applicability to the present situation of articles 6 and 8 of the Personal Property Law is not handicapped by the absence of limiting definitions as is the case with the Negotiable Instruments Law. Whereas the former, as enacted, had no heading nor syllabus of sections, its entire subject-matter is devoted solely to " certificates " and " shares " which in section 183 are respectively defined as meaning " a certificate of stock in a corporation organized under the laws of this State or of another State whose laws are consistent with this act " and " a share or shares of stock in a corporation," etc., as in the former definition. The documents in the present case do not comply with these descriptions. The rights represented thereby are not corporate shares but merely, as noted, " interests as a depositor." It follows that this article possesses no pertinence to the documents in suit.

The same observations apply to article 8 which purports to affect only " security receipts, equipment trust certificates and corporate bonds." Each variety of security contemplated by the

enactment is clearly and specifically defined (Pers. Prop. Law, § 260), the definition respecting " security receipt," which is the only one which might be considered applicable, even by the wildest stretch of the imagination, reading: " The term ' security receipt ' means any writing in and by which the signer sets forth that the person named therein or the bearer is *entitled to receive a specified principal amount, par value or number* of bonds, notes, debentures, shares of stock, voting trust certificates for shares of stock, scrip or other security or *securities* of any kind or character, identified or described therein absolutely, or when, as and if received by the signer or upon any other contingency stated or referred to therein." (Italics not in original.)

The essential requirement for applicability of this enactment to any given situation is that contained in the italicized words, namely, that the document must set forth that the holder thereof is entitled to receive, somehow or somewhere " a specified principal amount, par value or number of * * * securities." Compliance with this prerequisite to applicability of the enactment is wholly absent in the instruments at bar. All to which the holder is here entitled is " to share in the benefits of said agreement * * * and to the rights and interests as a depositor as the same are specified in said Deposit Agreement." Undefined " benefits." " rights and interests " under an agreement the terms of which are not disclosed, cannot be construed as the equivalent of " a specified * * * amount * * * of * * * securities."

The true scope and purpose of this statute becomes obvious when its enactment date, April 30, 1926 (Laws of 1926, chap. 704), is compared with the date of decision by the Court of Appeals in *Manhattan Co.* v. *Morgan* (242 N. Y. 38), which was January 12, 1926. The documents there in controversy were issued by J. P. Morgan & Co. and Guaranty Trust Company of New York, and, so far as is presently pertinent, read as follows:

" This is to certify, that the bearer is entitled to receive a Bond for One Thousand Dollars * * * of the Kingdom of Belgium * * * when as and if delivered to us in definitive form by the Obligor, and upon surrender of and in exchange for this certificate and the annexed interest warrant, subject, however, to the provisions following:

" If the Bond deliverable hereunder be not delivered prior to December 1, 1920, the interest thereon due on that date, will be paid upon presentation and surrender of the annexed warrant, provided moneys for the payment of interest on the Bonds of the issue shall have been received by the undersigned from the Obligor. * * *

" Every taker and holder of this certificate and the attached warrant hereby agrees that the undersigned may treat the bearer of this certificate and the attached warrant as the absolute owner hereof and thereof, as the case may be, for all purposes, and that the undersigned shall not be affected by any notice to the contrary."

Certain of these documents had been stolen from a holder and had found their way into the hands of a transferee for value without notice of the infirmity and the question of the title of the latter was the issue in the litigation.

In the illuminating opinion of Chief Judge CARDOZO, in which the remainder of the court unanimously concurred, the nature and quality of true negotiable instruments and those accorded some measure of negotiability by judicial quasi-legislation was traced, and the failure of the documents in suit to comply with the essential basic tests in this regard was convincingly demonstrated.

The exposition of the court ended with the following pregnant paragraph (p. 52): " We do not underrate the importance of permitting business to originate for itself the methods and instrumentalities that may be found by experience to be helpful to its free development. * * * There is force in the argument that wider freedom of choice through the spontaneous flowerings of custom would work a social gain. One of the debit items to be charged against codifying statutes is the possibility of interference with evolutionary growth. It is the ancient conflict between flexibility and certainty. So far as the Negotiable Instruments Law is concerned, the remedy for the evil, if it be one, is an amendment of the statute that will add to the negotiable instruments there enumerated or described such other classes as the law merchant or the custom of the market may from time to time establish. Until such an amendment shall be adopted, the courts in their decisions must take for granted that the Legislature is content with the law as it is written."

Pursuant to this implied suggestion, the Legislature, which was at that time in session, enacted article 8 of the Personal Property Law, and its terms, when compared with the provisions of the documents in controversy in *Manhattan Co.* v. *Morgan*, demonstrate conclusively the purpose of the enactment and the supposed defect in the law at which its remedial provisions were directed. When thus reviewed with its historical background, it is obvious that its explicit terms and the express limitations upon its applicability may not be extended by construction to include such documents of wholly diverse nature as are presently in suit.

Whereas the foregoing analysis would seem to demonstrate that instruments such as are present in the instant case are not of the description and nature contemplated in any statute of this State as capable of conferring a new and independent title upon a transferee for value and without notice of prior infirmity, this fact is not necessarily conclusive of this phase of the present controversy. As was noted in the foregoing excerpt from *Knox* v. *Eden Musee Co., Ltd.,* and has been stated from time to time in other pronouncements, judicial opinion has on various occasions extended " some of the elements of negotiability " to commercial documents other than those expressly recognized in existing statutes, and any adequate consideration of the present issues must take into account the instances of such extensions and the degree and incidents of the partial negotiability thus accorded. The phrase is frequent, that documents of this variety, which are not fully negotiable, are deemed " quasi-negotiable " (Cf. *Manhattan Co.* v. *Morgan,* 242 N. Y. 38, 48; *Union Trust Co.* v. *Oliver,* 214 id. 517, 523), and the next subject of inquiry must accordingly be concerning the extent to which this " quasi " limits the ordinary incidents of full and complete negotiability. In this search, the bases of the determinations according the noted " some of the elements of negotiability " must be discovered and their applicability to the situation at bar analyzed.

These bases are potentially two in number, namely, " by contract or estoppel." (*Manhattan Co.* v. *Morgan,* 242 N. Y. 38, 50; *State Bank* v. *Central Mercantile Bank,* 248 id. 428, 432.) Whereas, however, it may readily be agreed, as is stated in *Manhattan Co.* v. *Morgan (supra,* at p. 50), that " One may suppose a certificate whereby any and all holders forego and renounce their equities in favor of later holders for value and without notice," the fact remains, that diligent search not only by the court but presumably by the counsel in the present proceeding, has disclosed only a single instance in which the decision has been presumptively predicated on this ground, namely, *Gerard* v. *Bank of New York & Trust Co.* (265 N. Y. 336) and in this instance the question of negotiability was not involved in the litigation. The relevant observation of the court there was (p. 341): " An instrument such as the subject of this litigation may reasonably be regarded as a negotiable instrument, * * * and when the parties have treated it as such and proceeded to trial upon that theory, courts ought not to indulge in the assumption that it is anything other than a negotiable demand note. The parties to this contract have construed it for themselves and the courts."

The alternative basis of determination of " quasi-negotiability," namely, by estoppel, has, however, received frequent application and its limits are clearly defined. Any extended analysis of these adjudications would involve an expenditure of space and time wholly incommensurate with the advantage derivable therefrom. Their determinations are all based on the familiar equitable doctrine that " when one of two innocent persons is to suffer, the sufferer should be the one whose confidence put into the hands of the wrongdoer the means of doing the wrong." (*Union Trust Co.* v. *Oliver*, 214 N. Y. 517, 525; *N. Y. & N. H. R. R. Co.* v. *Schuyler*, 34 id. 30, 53; *Mc Neil* v. *Tenth National Bank*, 46 id. 325, 333; *Knox* v. *Eden Musee Co., Ltd.*, 148 id. 441, 459; *Van Schaick* v. *Nat. City Bank*, 245 App. Div. 525, 529.)

The usual factual demonstrations in these and similar cases present two typical situations, *first*, those in which the owner of an instrument, apparently negotiable in form, intrusts it to some person for a special purpose, but such person transfers it in violation of his instructions; *second*, those where an employee, acting within the scope of his apparent authority, but in reality in violation of his duty, originates and thereafter wrongfully transfers an instrument of the type in question.

It will be obvious that the two situations involve substantially the same legal principles and are both founded on the primary principle of agency, that as to third parties a principal is bound by acts of his agent within the apparent scope of his authority although these may, as a matter of fact, be in contravention of the instructions of the principal. (*Wen Kroy Realty Co.* v. *Public Nat. Bank & Trust Co.*, 260 N. Y. 84, 91; *Small* v. *Housman*, 208 id. 115, 123; *Walsh* v. *Hartford Fire Ins. Co.*, 73 id. 5, 10; *Glogowski* v. *Erie & Niagara County Farmers Ins. Assn.*, 216 App. Div. 654, 657.)

The limitations upon the applicability of this doctrine are, however, inherent in its statement, wherefore, if there was no agency in the person who improperly placed the document in circulation, as where it was stolen from the true owner (*Knox* v. *Eden Musee Co.*, 148 N. Y. 441, 456; *Hudson Trust Co.* v. *American Linseed Co.*, 232 id. 350, 361); or where the act was that of an employee having no apparent authority in the premises (*Manhattan Life Ins. Co.* v. *Forty-second St. & G. S. F. R. R. Co.*, 139 N. Y. 146, 149), no estoppel can arise, and the true owner may recover against the transferee in spite of the *bona fides* of, and payment of value by, the latter.

The observations of Chief Judge ANDREWS, in *Knox* v. *Eden Musee Co.* (148 N. Y. 441) at page 455 are especially relevant in this connection. He writes: " The courts have been frequently

importuned to extend the qualities of negotiability of stock certificates beyond the limits mentioned, and clothe them with the same character of complete negotiability as attaches to commercial paper, so as to make a transfer to a purchaser in good faith, for value, equivalent to actual title, although there was no agency in the transferrer, and the certificate had been lost without the fault of the true owner or had been obtained by theft or robbery. But the courts have refused to accede to this view, and we have found no case entitled to be regarded as authority which denies to the owner of a stock certificate which has been lost without his negligence, or stolen, the right to reclaim it from the hands of any person in whose possession it subsequently comes, although the holder may have taken it in good faith and for value."

Approaching the application to the present facts of the limits of the doctrine of "quasi-negotiability" as thus defined, two questions arise, namely, as to whether there is any demonstration of the creation of an agency by the infants, or whether there is any adequate evidence of negligence on their part sufficient to create an estoppel against them, even if it be granted that estoppel against an infant is possible, on which point the apparently relevant authority is to the contrary. (*Foley* v. *Mutual Life Ins. Co.*, 138 N. Y. 333, 343; *Ackley* v. *Dygert*, 33 Barb. 176, 193; *Brown* v. *McCune*, 5 Sandf. 224, 228. See, also, *Sternlieb* v. *Normandie Nat. Sec. Corp.*, 263 N. Y. 245, 250.)

The relevant demonstration of the record is merely that they signed their names upon the documents at the bequest of their father and natural guardian without any explanation by any one as to the nature of the transaction, and, inferentially, that they left the documents in his possession. The record is devoid of any showing either of any dealings or contracts whatsoever by them with Fitzgerald or Harcourt & Co., or any statements of any sort on their part. It follows that there is absolutely nothing upon which a finding could be based that Fitzgerald or Harcourt were appointed or acted as the agents of the infants, and an agency in the father, if found to exist, must be predicated solely upon the acts described, when viewed in the light of the relationship existing between the infants and their natural guardian.

Earlier impression to the contract notwithstanding (*Fonda* v. *Van Horne*, 15 Wend. 631, 634), it is, of course, now established that an infant may appoint an agent, although his agreement in this regard, like his other contracts, is voidable at his election. (*Casey* v. *Kastel*, 237 N. Y. 305, 311; 1 Williston Cont. p. 444.) The making of any contract by an infant, including one for the appointment of an agent, requires an affirmative demonstration of fact " that the

minds of the parties met on the precise terms of the agreement "
(*Lally* v. *Cronen*, 247 N. Y. 58, 62) and " on the thing to be done "
(*Farago* v. *Burke*, 262 N. Y. 229, 232). As hereinbefore noted, the
burden of establishing its affirmative defense rests upon the respond-
ent, and this applies to every link in the chain of exoneration
which it is attempting to forge, wherefore, if it is to be based on
the theory which is the subject of present discussion, the burden
is upon it of demonstrating the creation of the supposed agency
in the father by the infants. (*Oldman-Magee Boiler Works, Inc.*,
v. *Ocean & Inland Transp. Co.*, 210 App. Div. 183, 185.) This
cannot be spelled out of any words spoken by the infants, since,
so far as disclosed, they said nothing. The relationship of the
parties alone " is not a ground upon which agency can be assumed."
(*Le Count* v. *Greenley*, 6 N. Y. St. Repr. 91, 92; reported by memo-
randum only, 42 Hun, 655. See, also, *Ritch* v. *Smith*, 82 N. Y. 627,
629.) It follows that, in this aspect at least, there is an insufficient
demonstration to warrant a determination that an agency on
behalf of the infants existed, such as render applicable the doctrine
of estoppel upon which " quasi-negotiability " primarily rests.

The remaining question in this connection is as to whether the
act of the infants in leaving the documents in their father's
possession is such negligence as would justify the court in a deter-
mination that they had forfeited their rights to their patrimony.
The best reply to this query is found in the words of two dis-
tinguished chief judges of the Court of Appeals: " Faith in the
honesty of trusted friends and relatives is seldom negligence "
(CARDOZO, Ch. J., in *People's Trust Co.* v. *Smith*, 215 N. Y. 488,
492); " the mere possession of a chattel with the permission of
the owner does not enable the possessor to transfer a title by
estoppel. What is true of a chattel is true equally of things in
action " (Id. p. 493); " the employment of a servant to whom
is intrusted the master's property, with no power of disposition,
is not alone such a putting of trust and confidence in the servant
by the master as to enable the latter by his wrongful act to defeat
the master's title. The rule which would convert the mere employ-
ment of a servant into an authority in him, as to third persons,
to sell or dispose of his master's goods entrusted to him for safe
keeping, would be highly dangerous, and has no sanction in the
adjudged cases." (ANDREWS, Ch. J., in *Knox* v. *Eden Musee Co.*,
148 N. Y. 441, 459.)

It is obvious, therefore, that the application of the principle
that when one of two innocent persons is to suffer, the sufferer
must be the one placing confidence in the wrongdoer, would here

result in the liability of the respondent, since it was the only one giving credit to the acts of the persons purporting to deal with these documents.

The consideration of the potential " quasi-negotiability " of the documents in question has, up to this point, been based on the temporary hypothesis that they were of a type and character which might potentially become negotiable by operation of the law merchant. The original purpose in the rendering negotiable of commercial paper, as noted in the first quotation from *Knox* v. *Eden Musee Co.*, was " the encouragement of trade " and " the convenience of having some representative of money readily convertible and commanding confidence," and all of the various extensions of the doctrine to bills of lading, warehouse receipts, certificates of stock, bonds, security receipts, etc., have had the same object in view. All of these varieties of documents represent something definite and tangible in money, property or their substantial equivalents. Such documents in each instance represent a certain specified thing, definitely determinable from the particular piece of negotiable paper itself, and in so far as they have ever materially varied from this essential characteristic, they have become outlawed from the classification of negotiability.

The often-repeated epigrammatic statement of Chief Justice GIBSON (*Overton* v. *Tyler*, 3 Penn. St. 346, 347) that " a negotiable bill or note is a courier without luggage " is an epitome of the applicable principle. To perform its mercantile function, the rights which it represents must be so clear that " he who runs may read." Consonant with this thought conditions in a document of this type, which require investigation dehors the instrument respecting the extent or existence of rights represented thereby are usually deemed to destroy the quality of negotiability. (*Irving Trust Co.* v. *Leff*, 253 N. Y. 359, 362.) *Cessante ratione legis, cessat ipsa lex.*

In the case of the present documents, there is an obvious attempt to incorporate by reference an entire agreement presumably providing a plan for the reorganization of the affairs of the obligor corporation and an adjustment of the rights of the persons having claims upon its assets. Under such circumstances the document is in essence a contract which though abbreviated in form incorporates all of the various provisions of the frequently extremely complicated plans for the rehabilitation of a business or property which is on the financial rocks. The very nature of such a transaction renders the usual basis of the negotiability of commercial paper inapplicable thereto. Commercial paper is essentially simple and substantially uniform in form and content. Documents of the

character at bar must inevitably vary in effect in accordance with the exigencies of each particular case and the notions of the individuals promoting the deposit committees.

It is not inconceivable that in certain instances deposit receipts might be so drawn as to be negotiable but in such cases they would probably conform rather closely to the description of security receipts as contained in subdivision 1 of section 260 of the Personal Property Law. In the opinion of the court, the question of whether deposit receipts in general are or are not negotiable, is no more capable of categorial affirmative or negative reply, than would be the query, are cats black? All that is presently determined in this connection, therefore, is that the nature and circumstances connected with the transfer of the documents here in suit were not such as to convey to the respondents an original title similar to that of an instrument within the purview of the Negotiable Instruments Law.

The court has not overlooked the further argument of the petitioner based on the determination in *Zander* v. *New York Security & Trust Co.* (178 N. Y. 208) that the restricted mode of transfer authorized in the documents themselves amounted to further a limitation on their negotiability, and is inclined to believe it well founded, but deems extended discussion of this aspect unwarranted in view of what has already been said. *Graham* v. *White-Phillips Co., Inc.* (296 U. S. 27), to which the respondent refers, is not in point.

There remains for brief consideration the second portion of the respondent's defense which is based on the authority of *Casey* v. *Kastel* (237 N. Y. 305) and the provisions of section 105 of the Personal Property Law which provides in substance that where a seller has a voidable title, a purchaser from him may acquire a valid one if he pays value and has no notice. The applicability of this defense to the facts here present is conditioned on a demonstration that title to the documents in question was actually conveyed to Fitzgerald or Harcourt & Co. by the infants or by some one having authority to act on their behalf. This narrows itself to a conveyance by the infants themselves, by the infants through their father as their agent, or by their father by reason of his personal authority to act on their behalf. The first two possibilities have already been considered. There is no demonstration whatsoever of any personal dealings between the infants and Fitzgerald or Harcourt, and there is nothing in the record which either directly or by inference would support a determination of the existence of a relation of agency between the father and the infants.

The sole remaining matter for consideration is, therefore, the authority, if any, possessed by the natural guardian of an infant in respect to the personal property of the latter. The wholly uniform tenor of authority renders any divergence of opinion on this subject impossible. From the days of Blackstone, or before, to the present time, it has been the unvarying determination that parenthood or " guardianship by nature " " confers no right to intermeddle with the property of the infant, but is a mere personal right in the father or other ancestor to the custody of the person of his heir apparent or presumptive until attaining twenty-one years of age." (1 Lewis' Blackstone, 435, note 4.) To this may be added the statement made in *Foley* v. *Mutual Life Ins. Co.* (138 N. Y. 333, 343): " Such a guardianship of the infant's personal property is against the entire policy of our laws, and is sanctioned by no precedent and no practice in this State."

Similar pronouncements may be found in the following authorities among many others which might be cited: *Combs* v. *Jackson* (2 Wend. 153, 157); *Hyde* v. *Stone* (7 id. 354, 356); *Fonda* v. *Van Horne* (15 id. 631, 633); *Morrell* v. *Dickey* (1 Johns. Ch. 153, 156); *Genet* v. *Tallmage* (Id. 3, 4); *Williams* v. *Storrs* (6 id. 353, 357); *Houghton* v. *Watson* (1 Dem. 299, 301); 2 Kent Commentaries, 182.

It follows, in the case at bar, that the infants' father possessed no authority whatsoever to perform any act in respect to their property, wherefore his purported action in this regard could produce no other results nor convey any better title to any one than would have been possible by a thief of the documents. As a result, no title of any nature was transferred to Fitzgerald or Harcourt & Co., and they could transfer to the respondent no right superior to that which they themselves possessed. The documents while in the possession of the respondent were continuously the complete and unconditioned property of the infants, and since it purported to sell them on May 22, 1935, for the sum of $2,370, it must be held liable for this sum, which the event has demonstrated to have been " the proceeds or value of such property," with interest thereon from the date of the conversion, which occurred on May 22, 1935.

The court has not overlooked the testimony of Mr. Neumiller to the effect that the execution of the assignments on the reverse of the documents was in usual form for transfer, but this, in the opinion of the court, is wholly immaterial in view of their non-negotiability.

In spite of the unusual combination of factors presented in this proceeding, an examination of precedents demonstrates anew

the verity of the ancient adage respecting the lack of novelty in mundane affairs, since in 1886 a litigation presenting a situation substantially identical from a legal viewpoint was determined by the General Term for the First Department in *Smith* v. *Baker* (42 Hun, 504). There, Alice R. Baker, an infant of the age of sixteen years, was the owner of certain shares of stock which were indorsed by her in blank at the request of her natural guardian and then, without authority from her, pledged by him as security for a personal note. The action sought a recovery on the note and a realization on the pledged security. The observations of the General Term in respect to the rights of the infant might almost be employed verbatim in the adjudication of the situation now at bar. The report reads (at p. 505): " These shares of stock were part of her estate, and while she was under the age of twenty-one years * * *, at his request, she appears to have written her name upon the back of the certificate. This was done under no arrangement that the shares should be transferred to him, or that he should be at liberty to sell or dispose of them, and she was not given to understand what his purpose was in desiring her signature, or that it was to be placed, or was, in fact, placed upon the certificate of these shares. There was, accordingly, no intention on her part to supply him with the evidence of ownership of these shares, without which, in no event, could he have used or disposed of the shares themselves. (*Weaver* v. *Barden*, 49 N. Y. 286; *McNeil* v. *Tenth National Bank*, 46 id. 325.) " The opinion continues (at p. 506): " The dealings through which the right is insisted upon, of appropriating these shares of stock to the payment of this indebtedness, took place exclusively between the plaintiff's assignor and the acting guardian of this infant, and in no manner precluded her from asserting her right to the shares, and repudiating the act and conduct of the person under whose charge she had been during the greater period of her minority."

It follows for the reasons hereinbefore advanced and on the authority cited that the petitioner is entitled to judgment against the respondent for the sum of $2,370, with interest thereon from May 22, 1935.

Submit decree on notice in conformity herewith.