In the Matter of the Estate of ISAAC WEIDBERG, Deceased.

Surrogate's Court, Kings County, October 30, 1939.

*Morris Weinstein*, for Hyman Weisberg, as administrator, etc., petitioner.

*Topken & Farley*, for the German Consul, attorney in fact for Johanna Weidberg, Thea Weidberg Rothschild, Israel Weidberg and Johanna Weidberg, as guardian of Emanuel Weidberg.

*Miles F. McDonald,* special guardian for Emanuel Weidberg, infant distributee.

WINGATE, S. The issue here presented is as to whether it is within the authority, or is the obligation of this court to direct the payment into court of the distributive shares in this estate of four German nationals, apparently of Jewish race, or whether the sums in question may, or must, properly be paid to the German Consul in New York city or his attorneys. Three of the distributees, whose shares are in question, are said to be adults and one an infant. Two, including the infant, are now said to be residents of Palestine, one of Belgium, and one of Denmark.

In support of the contention of the German Consul or his attorneys that these sums should be paid to him or them, there has been presented a " Power of Attorney — Vollmacht " which is printed in English and German in parallel columns. This is a stock form of the German consular service with which this court has become quite familiar.

The English version reads in part as follows: " Know all men by these Presents, that we *Johanna Weidberg, residing at Berlin, N. Templinerstr. 17, Germany, individually and as legal guardian for her minor child Emanuel Weidberg, Thea Weidberg, residing at Berlin, Israel Weidberg, residing at Berlin,* do hereby make, constitute and appoint the German Consul at the City of New York, or his representative or successor in office, William J. Topken and Philip F. Farley, attorneys for the German Consulate General, 17 Battery Place, or any one of the aforesaid alone, our true and lawful attorney in fact."

The foregoing matter is wholly printed, with the exception of the portion which has been italicized, which is typewritten. The succeeding portions of the document, which extends over more than two large printed pages, accords the donee the broadest conceivable authority to deal with the interests of the donors in the estate of the decedent Isaac Weidberg. It is wholly printed except for three typewritten insertions of the name of the decedent.

The document is undated, but appears to have been acknowledged by Chaja Weidberg and Israel Weidberg before the United States Consul in Berlin, Germany, on October 20, 1938, and by Thea Rothschild " geb Weidberg " (*nee* Weidberg) on November 25, 1938, before Harold Ebbeson, notary public and public prosecutor, known in Sweden as " landefiskal," in and for the district of Stoby, Sweden. His authority in this regard is certified by the United States Consul at Goteborg, Sweden.

By chapter 343 of the Laws of 1939, in effect on April twenty-fourth of this year, an addition was made to section 269 of the Surrogate's Court Act. This reads as follows: " Where it shall appear that a legatee, distributee or beneficiary of a trust would not have the benefit or use or control of the money or other property due him, or where other special circumstances make it appear desirable that such payment should be withheld, the decree may direct that such money or other property be paid into the Surrogate's Court for the benefit of such legatee, distributee, beneficiary of a trust or such person or persons who may thereafter appear to be entitled thereto. Such money or other property so paid into court shall be paid out only by the special order of the surrogate or pursuant to the judgment of a court of competent jurisdiction."

At the time of its enactment, a note, explanatory of its scope and purpose, was appended to the bill. This must be considered in any interpretation of its effect. (*American Historical Soc.* v. *Glenn*, 248 N. Y. 445, 451, 452; *People* v. *Schweinler Press*, 214 id. 395, 404; *Matter of Greenberg*, 141 Misc. 874, 882; affd., 236 App. Div. 733; affd., 261 N. Y. 474; *Matter of Cluskey*, 169 Misc. 264, 265; *Matter of Pelcyger*, 171 id. 1016.) This note reads: " This amendment is proposed by the Executive Committee of the Surrogates' Association of the State of New York. The purpose of the amendment is to authorize the deposit of monies or property in the Surrogate's Court in cases where transmission or payment to a beneficiary, legatee, or other person resident in a foreign country might be circumvented by confiscation in whole or in part. The amendment authorizes the impounding of the fund by the Surrogate to await the time when payment can be made to the beneficiary for his own benefit, use and control."

Similar enactments were incorporated into sections 474 and 978 of the Civil Practice Act by chapter 672 of the Laws of 1939 and were accompanied by a similar note at the time of their consideration and enactment by the Legislature.

The conditions in certain foreign countries which motivated these enactments are matters of common knowledge. Under certain foreign governmental systems private ownership of property was and is either wholly or partially prohibited. In others, assets belonging to individuals, especially when in the form of foreign credits, are either seized and wholly appropriated by the authorities or are subject to compulsory exchange for local currency at a fraction of their intrinsic value.

As a result of these practices, benefits which an individual

decedent had dedicated to indicated beneficiaries, either by express testamentary instrument or by its virtual substitute of a " statutory will " (*Matter of Williams*, 162 Misc. 507, 509; affd., 254 App. Div. 741) under the Statute of Distribution, were diverted from their intended recipients to the promotion of international banditry and the propagation of ideologies which are a complete antithesis of the conceptions of a vast majority of American citizens and which have now plunged the continent of Europe into a second great war.

The primary object of this legislation was to promote the basic object and obligation of courts of decedent devolution to use their utmost endeavors to effectuate the express or implied wishes of a decedent respecting the disposal of his assets on death. Only subordinate to this purpose was the effort to prevent the diversion of assets here located to foreign governments whose conceptions of the proprieties were totally at variance with those which form the basis of the national existence of this country.

According to the terms of the statute, payment into court may be directed " where other special circumstances make it appear desirable that such payment be withheld." The nature of such special circumstances envisaged in the enactment is clarified in the note which states that it is applicable " in cases where transmission or payment to a beneficiary, legatee, or other person resident in a foreign country *might* be circumvented by confiscation in whole or in part." (Italics not in original.)

The italicized word " might " is the preterit of the word " may " and is equivalent to " had power " or " was possible " (*Owen v. Kelly*, 6 D. C. 191, 193), or, as defined in the Standard Dictionary, " have the physical or moral opportunity  *  *  *  to be contingently possible."

The question is, therefore, whether it is " contingently possible " that the sums due these distributees would be subject to confiscation in whole or in part if turned over to the German Consul or his attorneys.

The answer to this question must be in the affirmative. It will be recalled that substantially cotemporaneous with the execution of this power of attorney, the German government levied a mass fine of $400,000,000 upon all of its nationals of Jewish race by reason of the act of a single individual of their race in a foreign land. It has frequently and publicly been asserted and not denied, that this was a joint and several obligation imposed on all members of the race resident in the so-called Third Reich. According to reliable reports this mass fine has not been paid in full up to the

present time, and renewed efforts for its enforcement have been instituted. In view of these commonly known facts, it cannot be asserted that there is not a distinct possibility, whether or not these distributees are now alive, that if money belonging to them came into the hands of a German official or his representative, it might not be seized for this purpose, especially if, as is asserted is the present situation, they have escaped from the immediate territorial jurisdiction of the Gestapo and its concentration camps.

The question thereupon arises as to whether an exercise by the court of the authority accorded by the amendment to section 269 of the Surrogate's Court Act would violate the provisions of any controlling law. Necessary for consideration in this connection is the present treaty with Germany which is of especial importance in connection with the distributive share of the infant, since it is admitted that the power of attorney is not effective as to him by reason of the fact that his mother, who purported to execute it on his behalf, was not his legal, but only his natural guardian and consequently possessed no authority to act on his behalf in respect of his property interests. (*Foley* v. *Mutual Life Insurance Co.*, 138 N. Y. 333, 342; *Matter of Goodchild*, 160 Misc. 738, 756, and authorities cited.)

It follows that the only authority of the German Consul in respect of the share of the infant is such as is accorded by the terms of the treaty of the United States with his government. The only portion of this treaty which is here pertinent is found in article XXV, which reads: " A consular officer of either High Contracting Party may in behalf of his non-resident countrymen receipt for their distributive shares derived from estates in process of probate * * * provided he remit any funds so received through the appropriate agencies of his Government to the proper distributees, and provided further that he furnish to the authority or agency making distribution through him reasonable evidence of such remission."

In the present case it has been admitted that the infant is now in Palestine which is a British protectorate. The German government is now engaged in what the German Chancellor has stated to be " a war to the death " with that of Great Britain. It is, therefore, manifestly impossible for the German Consul either to remit to the infant the funds belonging to him " through the appropriate agencies of his Government " or to furnish to this court any evidence of such remission. It follows that there is no obligation under the treaty which in any wise conflicts with the application of section 269 of the Surrogate's Court Act, so far as the infant is concerned.

The main argument of the attorneys for the German Consul is, however, directed to their right to receive payment of the distributive shares of the adults. Their thesis on this phase of the controversy is predicated on the premise that they were individually designated as attorneys in fact by the power hereinbefore noted, and that there is no reason why they cannot, as individuals, carry out the obligation which would arise if the distributive shares were paid to them, of transmitting the avails to the adults.

One difficulty with the acceptance of this position is the fact that the appointee, according to the terms of the instrument, is " the German Consul at the City of New York or his representative or successor in office, William J. Topken and Philip F. Farley, *attorneys for the German Consul General.*" When read in their context, it is obvious that the italicized words are not mere *descriptio personarum* but are an essential part of the appointment, and that this is of the German Consul or his representative or successor or attorneys; in other words, of a representative of the German government in his capacity as such. It must follow that, as mere individuals, no authority has been accorded to them, and that collection by them other than in their capacities as attorneys for the German Consul General would be unauthorized.

In view of this fact, there is present in respect of the distributive shares of these adults, the same contingent possibility which has heretofore been considered, in the evaluation of the rights of the Consul under the treaty, that if payment thereof were made to the German Consul or his *alter ego*, the rightful recipients might not receive them. This again makes the terms of section 269 of the Surrogate's Court Act applicable.

It is said that one of the adult distributees is in Palestine, another in Belgium and another in Denmark. No proof of this has, however, been tendered other than the formal allegations of the petition which recites the fact only on the basis of " so far as can be ascertained with due diligence." None of them has been served other than by publication in the *Brooklyn Eagle*, which presumably does not enjoy an extensive circulation in any of these countries. Conceivably, some or all of them may be dead. In a war-torn Europe, the weight of the inference of continuance of existence becomes negligible. If such death has actually occurred, the chances that their rightful representatives would be actively sought out and the funds in question paid to them by representatives of the German government, do not appear bright.

There is precedent for denying recognition to a power of attorney under circumstances not remotely dissimilar to those here present

even when this resulted in continued liability of one who had paid the agent. The situation disclosed in *Fretz* v. *Stover* (89 U. S. [22 Wall.] 198) was that a resident of Pennsylvania had, prior to the outbreak of the Civil war, appointed a Virginia lawyer as his attorney to collect an obligation due from a resident of that State. The attorney, after the outbreak of the war, purported to act on this authority. The United States Supreme Court, in holding that the obligation was not discharged, said (at p. 206): "If he was authorized when he received the bond to collect it when due, in bank bills which were current in Virginia at the time, this authority was conferred in ignorance of, and without reference to, the contingency of war, and in the nature of things was revoked when war broke out."

An inevitable implied term of this, and every other, power of attorney is that it confers upon the donee only such authority as may be permissible of exercise under the laws of the place in which action thereunder is contemplated. The law of the State of New York forbids payment, other than to the individual distributee, of sums which may be due him in situations in which there appears to be a reasonable possibility that he will not receive the benefit thereof. This deprives him of no right, since the money is always available to him and is his for the asking at any time that reasonable assurance is forthcoming that he, and he alone, will get it. This statute, far from constituting an impairment of his rights, was designed as and in fact is, a potent protector thereof.

The attorney in fact possesses no personal rights whatsoever under the power. If the money were paid to him, he would receive it solely as a trustee for his principal. So far as concerns any rights to remuneration which he may possess, these are predicated solely on the value of the services which he may have performed in the past, and are not determinable in accordance with the power, except to the extent that it may demonstrate that his actions were not those of a volunteer. If, therefore, his delegated authority is held to be circumscribed by an application of section 269 of the Surrogate's Court Act, he is in precisely the same position as if his authority for further action had been terminated by the death of the donor of the power or some act of revocation of the authority previously accorded.

The attorneys here involved should be permitted a reasonable opportunity to seek remuneration for the services which they have performed up to the present time. This may be sought pursuant either to the provisions of section 231-a or section 231-b of the Surrogate's Court Act. For this purpose, entry of the decree will

be postponed for sixty days unless they shall stipulate otherwise. Upon the expiration of such period, a decree will be entered directing payment to the city treasurer of the net distributive shares here in question unless, in the interval, some demonstration be made that the sums to which the distributees are entitled are capable of payment to the individuals themselves without danger of confiscation or diversion, either in whole or in part.

The court expresses its appreciation of the extremely helpful report of Miles F. McDonald, Esq., the special guardian in this proceeding.

Proceed in conformity herewith.