In the Matter of the Accounting of the PUBLIC ADMINISTRATOR OF KINGS COUNTY, as Administrator of the Estate of MAX PERLINSKY, Deceased.

Surrogate's Court, Kings County, July 10, 1952.

*Daniel G. Connolly* for administrator, petitioner.

*Raphael & Dorman* for Gladys M. Dorman, as attorney in fact, and another.

*Arthur Block,* special guardian.

*Sol Hulnick* for Dorothea Krause.

*Nathaniel L. Goldstein, Attorney-General* (*P. Hodges Combier* of counsel), for unknown heirs.

RUBENSTEIN, S.   On this judicial settlement of the account, objections have been filed to the decree submitted by the Public Administrator.   The distributees are two sisters, one of whom resides in Belgium and the other in the Russian sector of the city of Berlin, Germany.   The decree submitted provides for the payment of the latter's share to the treasurer of the City of New York for her benefit, subject to the further order of the court, pursuant to section 269 of the Surrogate's Court Act. The objections are based on an alleged assignment by her to named assignees, one of whom is the sister in Belgium and the other a resident and citizen of this State.   The alleged assignees insist that the decree herein should provide for the payment to them of her distributive share as her assignees.   The question before the court is whether, as a result of this purported assignment, the distributive share should be paid to the alleged assignees or into court.

Section 269 of the Surrogate's Court Act was amended in 1939 so that the following matter was added (L. 1939, ch. 343): " Where it shall appear that a legatee, distributee or beneficiary of a trust would not have the benefit or use or control of the money or other property due him, or where other special circumstances make it appear desirable that such payment should be withheld, the decree may direct that such money or other property be paid into the surrogate's court for the benefit of such legatee, distributee, beneficiary of a trust or such person or persons who may thereafter appear to be entitled thereto. Such money or other property so paid into court shall be paid out only by the special order of the surrogate or pursuant to the judgment of a court of competent jurisdiction."

The following legislative note was appended: " This amendment is proposed by the Executive Committee of the Surrogates' Association of the State of New York. The purpose of the amendment is to authorize the deposit of monies or property in the Surrogate's Court in cases where transmission or payment to a beneficiary, legatee, or other person resident in a foreign country might be circumvented by confiscation in whole or in part. The amendment authorizes the impounding of the fund by the Surrogate to await the time when payment can be made to the beneficiary for his own benefit, use and control."

Shortly after the amendment of this section, this court had before it the question of whether to direct payment of distributive shares into court or direct the payment of the shares to one holding a " Power of Attorney — Vollmacht ", printed in English and German in parallel columns. In discussing this section, in *Matter of Weidberg* (172 Misc. 524, 531) Surrogate WINGATE said: " The law of the State of New York forbids payment, other than to the individual distributee, of sums which may be due him in situations in which there appears to be a reasonable possibility that he will not receive the benefit thereof. This deprives him of no right, since the money is always available to him and is his for the asking at any time that reasonable assurance is forthcoming that he, and he alone, will get it. This statute, far from constituting an impairment of his rights, was designed as and in fact is, a potent protector thereof."

Later in the same year, 1939, this court considered whether to direct payment to the city treasurer or to an attorney in fact, here resident, who asserted a right to receive a distributive sum. In *Matter of Landau* (172 Misc. 651, 653) Surrogate WINGATE was of the opinion that " an obligation was imposed

upon the court by the 1939 amendment to section 269 of the Surrogate's Court Act to direct deposit with the city treasurer in situations in which an affirmative factual finding was attained that the distributees would not have the benefit of the money."

In *Matter of Bold* (173 Misc. 545, 551), Surrogate FOLEY expressed the view that section 269 " was intended to safeguard " the beneficiary's " rights by permitting the moneys to be held until the time when it might be shown that the beneficiary, and he alone, would receive the funds."

The powers of attorney in *Matter of Weidberg* (*supra*) accorded the donee the broadest conceivable authority to deal with the interests of the donors. They appeared to have been acknowledged before the United States Consul in Berlin, Germany. Thus, at first glance, it would seem that their execution was the free act of the donors. However, the donors having been German nationals of the Jewish race, there can, at this time, be little doubt that the execution of a power of attorney to an official of the Nazi regime giving him possession of the funds was not the free act of the donors. What compelled the donors there to act is not known; but it is known that the donors were living in a totalitarian State. What constrained the alleged assignor to execute the instrument now before the court is not apparent. However, it may not have been her voluntary action since, in a totalitarian country, residents may be prompted to action by fear of harm to themselves or their families.

As to payment to distributees living under conditions such as exist at the place of residence of the alleged assignor, the Legislature has established the public policy of this State. Section 269 of the Surrogate's Court Act forbids payment to any other than the individual distributee when there appears to be a reasonable possibility that she will not receive the benefit thereof (*Matter of Weidberg, supra*), or where there is a factual showing that she will not have the benefit of the money (*Matter of Landau, supra*), and the money is to be held until the time when it might be shown that the beneficiary, *and she alone,* would receive the funds (*Matter of Bold, supra*).

Section 32-a of the Personal Property Law gives the Surrogate power to inquire into and determine the validity of an alleged assignment such as this. This power, and the duty imposed upon him by section 269 of the Surrogate's Court Act, compels the Surrogate when the question is properly raised to require an adequate demonstration that the distributee has or will receive the benefit or use or control of the money due her

when she is a resident of a foreign country where the transmission or payment of the fund might be circumvented by confiscation in whole or in part.

In the case at bar the alleged assignees insist that the alleged assignment is absolute and that the alleged assignor has no further interest in the estate; they further urge that there can be no circumvention of the statute as there can be no possible payment or transmission of the funds to the alleged assignor. The alleged assignees also direct attention to subdivision 4 of section 33 of the Personal Property Law, claiming that the alleged assignment should not be denied the effect of irrevocably transferring the alleged assignor's rights because of the absence of consideration since the alleged assignment is in writing and signed by the alleged assignor. Thus they assure the court that the distributee has not had the benefit or use or control of the money due her and they further assure the court that she will not have such benefit or use or control. From this it seems to the court that the result of recognizing and giving effect to the purported assignment will be the complete inversion of the purpose of section 269. The legislative intention was to make certain that the distributee, and she alone, will have the benefit or use or control of the funds, not the contrary. It might be said parenthetically that the Legislature in enacting subdivision 4 of section 33 of the Personal Property Law most probably had in mind instruments executed under circumstances where freedom of action is presumed.

In addition to the legal barrier prohibiting recognition of this alleged assignment, the papers presented in support of the alleged assignees' position indicate that there was no intention on the part of the alleged assignor to execute what we understand by an assignment or, in fact, that she had any idea that she was giving up her entire interest in the estate.

Before examining these facts shown in the papers, it may be well, at this point, to note that the alleged assignees express their approval of cases such as *Matter of Braier* (108 N. Y. S. 2d 417, affd. 279 App. Div. 1008) saying, '' Every one is in agreement that it is the official policy of the United States that there is no reasonable assurance that a beneficiary in areas under Communist control or domination will receive the benefit, use or control of the designated property after transmission and payment.''

They also cite *Lythgoe* v. *Smith* (140 N. Y. 442) where the Court of Appeals discussed a power of attorney which, they say, '' is only an agency in contrast to an assignment,'' and

they quote the following excerpt from page 446: "Where a power of attorney is produced to a referee, duly authenticated and acknowledged, it may be prudent to obtain the sanction of the court to recognize and make payment thereon, but when application for such authority is made and the facts appear as in this case, and they are wholly uncontradicted, and there are no suspicious circumstances surrounding the application, we think it is the duty of the court to authorize and direct the payment as provided for in the power, and the refusal to make such direction is the denial of a legal right."

This court, however, is of the opinion that the language immediately following the above quotation is better fitted to this proceeding, as will hereinafter appear. It is as follows: "We should undoubtedly refuse to interfere with the order of the court below in any case where the material facts were not in substance admitted or *where there was any ground for suspicion regarding the power or the manner of its procurement.*" (Emphasis supplied.)

The events as understood by the alleged assignee resident here are that a power of attorney was executed to her by the alleged assignor on August 16, 1951. After correspondence, the American Consul in Berlin suggested that it might be possible to transmit the funds to the Berliner Zentralbank in a blocked account in the American Zone, so that daily amounts could be withdrawn for sustenance. This was not thought feasible. The alleged assignor was advised of this and the alleged assignee received a letter, dated December 18, 1951, saying that under the circumstances she wished her share to go to her sister in Belgium, and another letter, dated January 4, 1952, appeared to confirm this. On January 23, 1952, a letter was written to the American consulate enclosing an assignment and also a letter to the alleged assignor which the Consul was asked to translate. The alleged assignor was advised to go to the consulate. On March 6, 1952, a letter was received from the alleged assignor which was construed as advising that she had been to the consulate and had executed the assignment.

The German letters attached to the papers seem to present a markedly different situation. Unfortunately, it was not seen fit to attach copies of all the correspondence for the enlightenment of the court. One of the letters, the one of March 6, 1952, is not accompanied by a translation. Since it is part of the record, the court has taken the liberty of having it translated; and not being quite satisfied with the translations of the other two letters, the court has caused these, too, to be translated.

These latter translations are accepted by the court as accurate, and the version therein is used in this opinion.

The correspondent was the husband of the alleged assignor and his letters are the ones in the papers. His letter of December 18, 1951, reads, in part, as follows:

" As per your proposal, I have written to the sister of my wife [name omitted], and with the consent of my wife have agreed upon that the share falling to my wife together with the share of the [name omitted] be transmitted to the account of the named; it might be expedient to keep a separate account.

" I assume that the power of attorney executed for you by my wife is also sufficient for this arrangement."

Following this came the letter dated January 4, 1952. Part of this is as follows:

" It would be very acceptable to my wife if it were possible according to the proposal by the American Consul to transmit the possibly falling due money to the Berliner Zentralbank in Berlin (in the American Sector). If the Court approves this proposal, I beg you for your esteemed notice. My wife will then have an account established for herself in this bank and I shall immediately forward you the account number. Should the Court, however, not approve this proposal, it would have to remain as agreed (muesste es dabei bleiben), to transmit along (mit zu ueberweisen) this amount in the name of the sister of my wife — [name omitted].

" The peculiar circumstances cause us to address another request to you. Would you forward the specific details to the named [name omitted], who will then give us further notice in suitable form. It would then be sufficient, if you will be so kind, to tell us that you have written to [name omitted]."

The court is told that the phrase " *mit* zu ueberweisen " indicates that another amount is expected to be transmitted at the same time.

The third and last letter (the one to which no translation is attached) reads in part as follows: " On the 25th of February my wife signed the declaration of power of attorney (Vollmachtserklaerung) at the American Consulate in Berlin-Steglitz. It was assured at the Consulate that the power of attorney (Vollmacht) will be dispatched to you."

These letters evidence no intention of the alleged assignor to divest herself of her interest in this estate. Her share was to be sent along to her sister: " it might be expedient to keep a separate account." The amount was to be transmitted " in the name of the sister ", not to her absolutely. The power of

attorney previously given was considered sufficient for this arrangement. For what arrangement? That power of attorney heretofore filed herein specifically provided for remitting the proceeds to the alleged assignor.

The sequence of the letters also is of interest. First, on December 18, 1951, it was agreed that the alleged assignor's share, together with her sister's, was to be transmitted to the account of the latter, a separate account to be kept as " expedient ". Thereafter, on January 4, 1952, if the proceeds were not to be sent to the Zentralbank, (muesste es dabei bleiben) it would have to remain as agreed, (*mit* zu ueberweisen) to transmit *along* this amount " in the name of the sister " — to the " expedient " separate account, no doubt. The power of attorney of August 16, 1951, was ample to accomplish just that. In fact, the letter of December 18, 1951, assumed " that the power of attorney executed for you by my wife is also sufficient for this arrangement." However, cases like *Matter of Braier* (*supra*) stood in the way: something more was needed to satisfy the Surrogate.

Most surprising is the untranslated letter of March 6, 1952, which uses the terms " Vollmachtserklaerung " and " Vollmacht ", terms ordinarily employed to designate a power of attorney, not an assignment. The word " Abtretung " or some word of similar import does not appear therein.

The alleged assignee's own letter shows that the American Consul had been requested to translate the letter accompanying the papers; no request was made to translate the instrument itself which, unlike the " Vollmacht " in *Matter of Weidberg, supra,* is entirely in English. That letter uses the term " assignment " in English. In reply, the letter from the American Consul says nothing about translating anything; but assuming that the alleged assignee's letter was in fact translated there still would remain the question of the Consul's being sufficiently well versed in the German tongue to be able to explain that the instrument was not a " Vollmachtserklaerung " but an " Abtretungserklaerung ".

From the foregoing it would appear that there is enough in the papers themselves to indicate that the alleged assignor might have intended to have the funds transferred to her sister for further transmission to her; and that she executed the alleged assignment in the belief that it was a power of attorney in furtherance of that intention; and that she had no intention of divesting herself of any further interest in the funds.

Heretofore, various efforts have been made by those representing distributees in the Soviet dominated areas to have the funds released from the control of the Surrogate. *Matter of Braier* (*supra*) is an example; another is *Matter of Alexandroff* (183 Misc. 95) where Surrogate FOLEY noted newly discovered theories contrived by ingenious attorneys. A third such example is *Matter of Getream* (200 Misc. 543) where Surrogate HAZLETON had this to say at page 544: " Since Hungary is a member of this bloc of communist captive countries, this court would consider sending money out of this country and into Hungary tantamount to putting funds within the grasp of the Communists. (*Matter of Yee Yoke Ban,* 200 Misc. 499.) " Surrogate HAZLETON then continued: " To circumvent this, there has been seized upon the clever device of having the national of the captive country, as in this proceeding, execute a power of attorney to a national of the United States, authorizing the attorney in fact to receive the moneys inherited by the one behind the Iron Curtain. Under such circumstances, could this court be confident that its order would not be defeated by the funds ultimately percolating in a roundabout way into the country behind the Iron Curtain? I am not sufficiently naïve to accept the assurance that this could not happen."

It may be just possible that some of these powers of attorney have been forwarded to closely related American nationals by officials of the country to which money may not be remitted together with a covering letter, which, perhaps, might contain a hint such as " You are kindly requested to transfer the sums deriving from the estate to your brother as soon as possible," or some other equally diplomatically couched " request ".

If the court were to recognize the alleged assignment herein, cases such as *Matter of Braier* (*supra*) would be set at naught. To borrow language from *Gillette* v. *Madden* (280 App. Div. 161, 163) used in speaking of an alleged illusory transfer of property, "[A]ll that would be needed would be to put together the right words to say the thing " and section 269 " would dangle on a formalism. Words will usually be found for an instrument of this sort good enough for the purpose at hand." In cases such as this, by the simple expedient of changing the label the gate would be open, and, as here, the powers of attorney previously given would be replaced by " assignments ". The court will not be blinded by a label or a fixed formula of words. As it was said in another connection by Judge CONWAY in *People* v. *Jacoby* (304 N. Y. 33, 39): " [W]e have never so exalted form that in the act of so doing it has

been necessary to put aside reason and substance. Where justice and reasonableness pointed the way we have not hesitated to treat a paper, which was of a particular form, as that which it was in truth and substance ''.

The alleged assignment herein has the same baneful effect as the power of attorney in *Matter of Getream* (*supra*) and other like cases. Special circumstances make it appear desirable to withhold payment (Surrogate's Ct. Act, § 269; see, also, *Matter of Mark*, N. Y. L. J., July 14, 1952, p. 77, col. 5, decided herewith).

The alleged assignor's distributive share will, accordingly, be directed to be paid into court, subject to the further order of the court.

Decree signed.